2018 IL App (2d) 170617
No. 2-17-0617
Opinion filed July 20, 2018

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| DANIEL HITES, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 14-CH-398 |
| | ) | |
| WAUBONSEE COMMUNITY COLLEGE, | ) | Honorable |
| | ) | David R. Akemann, |
| Defendant-Appellee, | ) | Judge, Presiding. |

JUSTICE SPENCE delivered the judgment of the court, with opinion.
Presiding Justice Hudson and Justice Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1     This is an appeal from the circuit court's order granting the motion of defendant, Waubonsee Community College (WCC), to dismiss the complaint of  plaintiff, Daniel Hites, pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2016)). Plaintiff's initial complaint sought certain disclosures of public records, including electronic data from WCC's databases, pursuant to the Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2016)).  On remand following a prior appeal from a dismissal, seven FOIA requests for electronic data remained in plaintiff's complaint.  The circuit court determined that WCC's compliance with those seven remaining FOIA requests would be unduly burdensome under section 3(g) of the FOIA (*id.* § 3(g)) and dismissed the complaint.  We reverse and remand.

¶ 2                                    I. BACKGROUND

¶ 3     Plaintiff filed his initial complaint against WCC on March 18, 2014, seeking both physical and electronic records pursuant to the FOIA.  In May 2014, WCC moved to dismiss the complaint, arguing, *inter alia*, that plaintiff's requests would improperly require it to create new records.  Following an evidentiary hearing in March 2015—the relevant portions of which we summarize *infra*—the circuit court granted the motion to dismiss.  The court determined that plaintiff's requests for electronic data would impermissibly require WCC to create new records and that plaintiff's requests for physical records would constitute an undue burden on WCC.  It did not address whether the requests for electronic data would be unduly burdensome.

¶ 4     On appeal, we affirmed in part, reversed in part, and remanded.  *Hites v. Waubonsee Community College* (*Hites I*), 2016 IL App (2d) 150836, ¶¶ 83-84.  We determined that data on two of WCC's databases—the Banner and the Driver Safety databases—were public records subject to disclosure under the FOIA (*id.* ¶¶ 67-72) but that some of plaintiff's requests for electronic data would require the creation of new records (*id.* ¶ 79).  We therefore affirmed the dismissal of plaintiff's requests that would require the creation of new records and reversed on those requests that would not.  *Id.* ¶ 83.  The appeal did not concern plaintiff's dismissed requests for physical records, and we did not address whether the requests for electronic data would constitute an undue burden, as that issue was not properly before us.  *Id.* ¶ 55.  On remand, the following FOIA requests were at issue: (1) the ZIP codes of all people taking the National Safety Council's Defensive Driving Course (DDS-4) in 2011, (2) the ZIP codes of all people taking general equivalency diploma (GED) classes in the fall of 2011 at the Aurora campus,  (3) the ZIP codes of all people taking English as a second language (ESL) classes in the fall of 2011 at the Aurora campus, (4) the raw input for the "city" field on the student registration

forms for all students registered in the fall of 2011 at the Aurora campus, (5) the raw input for the "county code" field on the student registration forms for all students registered in the fall of 2011 at the Aurora campus, (6) the raw input for the "U.S. Citizen" field on the student registration forms for all students registered in the fall of 2011 at the Aurora campus, and (7) the raw input for the "Are you in the United States on a visa—nonresident Alien" field on the student registration forms for all students registered in the fall of 2011 at the Aurora campus.

¶ 5                    A. Post-Remand Briefing

¶ 6     WCC moved to dismiss the remaining FOIA requests and filed a post-remand status brief on April 12, 2017, arguing that its compliance with the remaining requests would be unduly burdensome. WCC argued that it presented evidence of an undue burden at the March 2015 evidentiary hearing when it sought to rebut the testimony of Alexander Deligtisch, plaintiff's expert witness, and that the record otherwise established that searching for and extracting the requested electronic data would be unduly burdensome. It argued that its database system was complex, handling every major function at WCC, and that the data requested did not reside in any single database or report. WCC cited testimony from the March 2015 hearing that it would take WCC staff at least a week to develop a program to respond to each of plaintiff's remaining FOIA requests.

¶ 7     WCC continued that in *Hites I* we "made a finding" that WCC had two databases with information responsive to plaintiff's FOIA requests, namely, the Banner and the Driver Safety databases. It argued that "[t]his finding is not supported by the record." WCC also noted that Deligtisch suggested that WCC could obtain responsive information from the Data and Information System Illinois (DAISI) database. WCC argued that this assertion was incorrect because it did not control, maintain, or operate DAISI. WCC stood ready to provide evidence

for its assertions, including the testimony of its programmers, at an additional evidentiary hearing.

¶ 8     Plaintiff also filed his status brief on April 12, 2017. He stated that the "question of burden imposed by [his] requests for information from WCC's databases *** was not raised in WCC's motion, and thus [was] not yet properly before the court." In the alternative, he argued, the motion could be decided on the existing record and should be denied. In particular, plaintiff argued that he had presented evidence that established the "minimal time and effort" that would be required for WCC's compliance with his FOIA requests, including that WCC had access to the relevant databases and that the data was extractable by WCC employees. He cited Deligtisch's testimony that an information technology (IT) professional would be able to search for the requested data in less than one minute; that the results could easily be exported into an Excel spreadsheet; and that all of plaintiff's requests could be answered in about five minutes. Plaintiff also offered to provide supplemental evidence, such as the user manuals for the relevant databases, at the court's request.

¶ 9     On April 19, 2017, the circuit court found that the issue of undue burden was properly before it. The court would consider WCC's pending motion to dismiss based on the current record.

¶ 10                    B. March 2015 Evidentiary Hearing

¶ 11     We now recount the relevant testimony from the March 2015 evidentiary hearing on which the circuit court based its findings.

¶ 12     Terrence Felton testified as follows. He was the chief information officer at WCC, and his duties included responding to FOIA requests. WCC maintained multiple databases. The Banner database stored information regarding GED and ESL classes and it also handled "every

major function of the college," including financial aid, human resources, and inventory. The Banner database had over 3500 tables and was around 250 gigabytes in size. Information related to the National Safety Council's Defensive Driving Course was stored on a separate, "massive" database, the Driver Safety database. The information stored on both the Banner and the Driver Safety databases included ZIP codes for students.

¶ 13    The information plaintiff requested resided on the Banner and the Driver Safety databases, but WCC did not have programs to retrieve the data. Retrieval would require writing a program to search the appropriate database and produce a file. Felton believed that it would take "at least a week" for one person to write a program to retrieve from the Driver Safety database the ZIP codes for the students taking the defensive driving course. A member of his staff would have to write the program, and only a select few were available to do so. Writing the program would "just sort of be another multiple thing [*sic*] that they were doing." A staff member would have to write a different program to retrieve from the Banner database the ZIP codes for the students taking ESL courses in 2011 and yet another program to retrieve the ZIP codes for the students taking GED classes in 2011. Writing each additional program would require an additional week of work by his staff, "given everything else that they're doing from an operational standpoint." They would have to "stop doing their other jobs and do this." When asked later, on rebuttal, whether compliance with plaintiff's FOIA requests could result in overtime costs, he responded "Possibly, yeah." He explained that, "given the vast amounts of data requested," the searches could not be done all at once. Instead, they would have to be done over multiple days or weeks when there was time for his staff to perform them.

¶ 14    Turning to the "raw input" request for the "city" field on student registration forms, Felton testified that a staff member would again have to write a program, run it on the Banner

database, and output the file.  He would also need to "clear up this question about 'Registered,' " as WCC did not store data points on who was registered.  It would again take a week to write a program and retrieve the responsive data.  The same process would apply to the requests for the raw input for the county code, U.S. citizen, and nonresident-alien fields on the registration forms, with WCC requiring a week to respond to each request.

¶ 15    After discussing retrieval of information from the Banner and the Driver Safety databases, counsel asked Felton about other databases.  He testified that WCC had other databases and that it also had access to DAISI, which the school used but did not maintain.  DAISI was run by the State of Illinois.

¶ 16    On cross-examination, counsel first questioned Felton about the Banner database.  Felton stated that Banner was a relational database made by Oracle and housed by WCC and that the school had been using Banner since 2007.  Banner tracked, among other things, students' names, street addresses (including county), and ZIP codes.  It tracked the names, times, and locations of courses that students had taken, and it also stored information about whether students resided in or out of the district and were U.S. citizens.  A user with access to the Banner database could search and extract information from the database, including ZIP codes.

¶ 17    Felton agreed that Banner could be searched for the names and ZIP codes of all students taking ESL classes in 2011, explaining that "[y]ou could write a program to do pretty much anything you want."  It was possible to write programs to respond to all of plaintiff's FOIA requests for information from the Banner database.  Counsel then asked whether "that would all come out of the DAISI database," to which Felton responded, "No."  Counsel continued, "[t]hat would all come out of the Banner database?" and Felton responded, "Yes."  Felton did not know much about DAISI, and WCC did not own, operate, or maintain DAISI.

¶ 18    After this exchange about DAISI, counsel turned to the Driver Safety database. Felton testified that the Driver Safety database operated similarly to Banner. It was a relational database, and it tracked students' names, ZIP codes, and classes taken, including when and where those classes were taken. As in Banner, it was possible to write a program to search and extract students' ZIP codes for a certain driver safety class at a certain campus. As in Banner, "[y]ou can write a program to do anything."

¶ 19    When asked why writing each program would take a week, Felton answered, "because those people have other responsibilities." When asked whether it would take someone a week to actually write a program to search the Banner or the Driver Safety database, he answered no. When asked how long a staff member would take to extract the ZIP codes of all students taking the National Safety Council's Defensive Driving Course in 2011—assuming that the person did nothing but write the program—Felton said that he "would give them a day." Felton's one-day timeframe applied to each of plaintiff's remaining FOIA requests.[1] Felton explained that he had two staff members who could write programs to respond to plaintiff's FOIA requests. Both staff members were systems analysts who had held their positions for at least 10 years. He had consulted with them about plaintiff's FOIA requests, and they told him that responding to each request would take about a day.

¶ 20    Deligtisch testified next, and our summary of his testimony is drawn in part from our prior opinion, *Hites I*, 2016 IL App (2d) 150836, ¶¶ 18-20. Deligtisch was accepted by the circuit court as an expert in the field of database analytics, and he testified as follows. He

_____

[1] Felton testified that one of plaintiff's FOIA requests would have taken two or three days, but that specific request is not at issue here, as we affirmed the dismissal of that request in our prior opinion.

worked with databases, both relational and nonrelational, on a daily basis, and he often worked to extract responsive data without extracting personally identifying information. He identified both the Banner and the Driver Safety databases as relational databases, which stored data in a grid format, although he admitted that he had not personally worked on those databases. Relational databases were common and widely used by businesses. Relational databases were like Excel spreadsheets, organizing data in columns and rows, forming tables. "One would expect [a relational database] to have many tables."

¶ 21 Searches across multiple tables not only were possible but were the purpose of a relational database. For instance, a relational database allowed for a search of the ZIP codes of all students taking a particular class—"from the perspective of these relational databases, it really [did not] matter if there [were] ten rows of students or 20 million rows of students." In order to perform a search for ZIP codes, one would have to write code to perform the search, but this did not constitute writing a program. Rather, the query would essentially say, " 'Go to this table, look at these columns, pull out this data and put it in a spreadsheet or a grid for me.' " Writing the necessary query would take less than one minute, and the entire process—from writing the query to producing a chart with the requested data—would take two to five minutes. Each query would be a short language command, around 10 to 20 words, and the database would provide the information in a grid that looked like an Excel spreadsheet. Relational databases allowed the user to quickly extract the data and put it in an Excel format.

¶ 22 Deligtisch did not believe that he needed to work with the Banner or the Driver Safety database to render his opinion, because every relational database was set up in the same format and utilized the same code and tools. He analogized running a search query on a relational database to pulling out responsive files from a filing cabinet.

¶ 23    Plaintiff testified as follows.  His interest in WCC and its governance went back to around 2010.  WCC was located in a "special service area," which meant that those in the area got "taxed a little bit more than any other place in Aurora."  The tax funds went to an oversight committee called Aurora Downtown, and the committee's goals were "to help revitalize, beautify, and bring back downtown."  He was a member of Aurora Downtown, and he was the chairman of the parking committee when Aurora Downtown was founded.  In his function as parking-committee chairman, he noticed that Aurora's downtown parking study was "out of balance" and that the study underestimated the number of parking spots for WCC's new downtown campus by up to 800 spots.  Plaintiff had walked around the downtown campus and, he stated, "you really don't see any students out there.  There aren't any businesses that work with them.  It has not had any real economic benefit."  He wanted to find out who the students were, how to market to them, and how the committee could orient WCC to help reinvigorate downtown Aurora.

¶ 24    At this point, the court interrupted, stating that it did not understand how plaintiff's testimony was related to the issue before the court.  Counsel responded that the testimony went toward establishing the public interest that needs to be balanced with the burden of compliance.

¶ 25    Later in plaintiff's testimony, counsel returned to the public-interest issue, asking him whether there were other reasons, beyond inconsistencies in the parking study, that made him believe that the information he sought from WCC was for the public good.  Plaintiff answered that WCC had a responsibility to help the community "move along" and to live up to its commitments to the community after "spending $45 million on a new campus."  There were "numerous agreements" between WCC and Aurora in which Aurora gave WCC incentives and

preferential treatment, and the requested information could help show whether WCC was operating in the best interests of Aurora and whether those agreements should be reconsidered.

¶ 26 Plaintiff continued that he was not against WCC having its campus downtown, but he wanted to make sure that WCC was serving Aurorans. He wanted to see the downtown campus "balanced out," and he worried that WCC's catering to GED and ESL students from outside Aurora resulted in students from Aurora attending classes at campuses outside Aurora instead of at the downtown campus that was built for them.

¶ 27             C. Circuit Court's Order Granting WCC's Motion to Dismiss

¶ 28 On June 10, 2017, the court granted WCC's motion to dismiss, finding that WCC had shown that compliance with plaintiff's FOIA requests would constitute an undue burden.

¶ 29 The circuit court first recounted the relevant testimony of Felton, Deligtisch, and plaintiff from the March 2015 evidentiary hearing. It noted that plaintiff testified that he had become interested in the requested information when he was part of Aurora Downtown. Plaintiff wanted to determine a way to market WCC's downtown Aurora campus in an effort to revitalize downtown businesses. The court continued that plaintiff also stated that he wanted to determine whether WCC was fulfilling the promises it made in spending $45 million on a new campus. The court cited his testimony that there were " 'numerous agreements between [WCC] and the City of Aurora where Aurora [was] giving incentives *** to [WCC] that would have to be reconsidered if it's showing that [WCC] is not working in the best interests of Aurora' " and that he wanted to ensure that Aurora students were not being sent out of the city to go to classes on the campus in Sugar Grove.

¶ 30 The circuit court then moved to its undue-burden analysis, stating that, in order for a FOIA request to be unduly burdensome, three elements had to be present: (1) compliance with

the request as stated must be unduly burdensome, (2) there must be no way to narrow the request, and (3) the burden on the public body must outweigh the public interest in the information. The court looked to cases on the issue. The only case the court cited in which an undue burden was found was *Shehadeh v. Madigan*, 2013 IL App (4th) 120742, ¶¶ 5, 34-35, which addressed a request to manually review over 9000 physical records to determine whether those "publications, opinions, reports, or other records" could be used by the Attorney General (AG) for guidance in complying with the FOIA. For instances where no undue burden was found, the court cited several authorities, including *National Ass'n of Criminal Defense Lawyers v. Chicago Police Department*, 399 Ill. App. 3d 1, 14-17 (2010) (no undue burden where redacting documents would take 150 hours, or approximately 20 personnel days, but the burden did not outweigh the public interest), and an AG opinion, 2016 Ill. Att'y Gen. Op. No. 16-008, at 7-8, http://foia.ilattorneygeneral.net/pdf/opinions/2016/16-008.pdf (Drumm opinion) (no undue burden although request for city official's e-mails would yield at least 174 responsive pages and would require review for possible redaction, with only one IT staff member and one FOIA officer available, who each had other duties). The court, citing *Hites I*, also looked to federal authority for guidance, including a case in which a search for 1711 names in a database did not constitute an undue burden. *Hall v. Central Intelligence Agency*, 881 F. Supp. 2d 38, 53 (D.D.C. 2012). The court stated that, in the absence of direction from this court or our supreme court, it would look to the most recent appellate court decision, namely, *Shehadeh*.

¶ 31    The court concluded that the undue-burden exemption applied to plaintiff's remaining FOIA requests. It first explained that WCC had complied with the FOIA by responding to plaintiff's FOIA requests in writing and providing him an opportunity to narrow his requests

when WCC stated, in its response to the requests, "[t]o the extent Mr. Hites has a proposal to narrow his requests, please contact us."

¶ 32    Next, the court found Felton's testimony credible in explaining WCC's burden in complying with plaintiff's FOIA requests. Felton was "in a superior position to estimate the amount of time it would take to query the databases *** compared to Mr. Deligtisch." Felton testified that responding to just one of plaintiff's requests would take his staff at least a week, and the court concluded that responding to all would require "well beyond 150 hours, or twenty personnel days, and would likely be more time-consuming than redacting 174 responsive pages."

¶ 33    The court continued that compliance would impede WCC staff members' ability to perform their other duties in a timely manner. Citing WCC's status brief, it found that some of the requests would require searching databases "not in the control" of WCC, including DAISI. It also concluded that WCC "would be required to compensate its programmers to spend several weeks or months on responding to these requests, which might include overtime and/or hiring extra staff."

¶ 34    Finally, the court found that WCC's burden outweighed the public interest. It found that plaintiff's interest was to "learn what demographics of students are attending each WCC campus in order to speculate about what businesses that the students might frequent." His interest was not comparable to the public importance of requests for data that would improve lineup protocols and remedy mistaken eyewitness identifications. See *National Lawyers Ass'n of Criminal Defense Lawyers*, 399 Ill. App. 3d at 15-16. Furthermore, the court found that plaintiff's interest made "assumptions about demographics of students and the economic growth that these students might bring to downtown Aurora, which is not based on any evidence." Accordingly, the court granted WCC's motion to dismiss.

¶ 35    Plaintiff timely appealed.

¶ 36                            II. ANALYSIS

¶ 37                      A.  The Parties' Positions

¶ 38    On appeal, plaintiff argues that we should reverse the circuit court's order granting WCC's section 2-619 motion to dismiss, because WCC did not establish that compliance with his requests would be unduly burdensome.  Plaintiff argues that, under the FOIA, exceptions to disclosure should be read narrowly, including the "unduly burdensome" exception under section 3(g) (5 ILCS 140/3(g) (West 2016)).  He argues that WCC failed to establish any of the three necessary elements of an undue burden: (1) that compliance with his FOIA requests as stated would be unduly burdensome, (2) that there was no way to narrow the requests, and (3) that the burden on WCC outweighed the public interest in the information requested.

¶ 39    Addressing the first element, plaintiff argues that WCC's description of its alleged burden was not sufficiently detailed for adversarial testing.  Moreover, he contends that WCC could easily extract the requested information from its databases.   He argues that WCC's databases are typical Oracle databases designed for storing and retrieving the type of data requested and that Felton testified that the data could be retrieved from WCC's databases.  Plaintiff cites Deligtisch's testimony that the entire retrieval process would take a matter of minutes.

¶ 40    Plaintiff also argues that WCC's alleged burden was improperly padded with time that staff members would spend performing other activities.  He argues that Felton's estimate of each search taking a week to perform assumed that the search would be improperly done and need to be repeated; included conversations about the search; and included his staff members' other duties.  Plaintiff urges that a proper FOIA undue-burden analysis should focus on the time

needed to actually retrieve the records, not on time estimates inflated by tasks beyond the retrieval.

¶ 41    Plaintiff next argues that the circuit court's reasoning on undue burden was flawed.  The court relied on one case that found an undue burden, *Shehadeh*, 2013 IL App (4th) 120742, because it was "the most recent decision of the Illinois Appellate Court" on the matter.  Plaintiff contends that the court's focus on *Shehadeh* ignored the totality of precedent in Illinois and that its application of *Shehadeh* did not actually support a finding of undue burden in this case.  To wit, he argues that the FOIA request in *Shehadeh* would have required staff to go through each file by hand to locate responsive documents, whereas here the data requested was already collected and stored on WCC's databases.  No WCC staff member would have to review documents or redact information.  Plaintiff stresses that the purpose of having a database is that it is more efficient and easier to use than storing and reviewing hard copies of documents.

¶ 42    Turning to the second element, plaintiff argues that WCC has not established that there was no way to narrow his requests.  He argues that, if his requests can be narrowed, then WCC did not meet that requirement for the undue-burden exemption; and if his requests cannot be narrowed, then the circuit court's finding that his requests were unduly burdensome would effectively shield WCC from all future FOIA requests for information from its electronic databases.

¶ 43    Finally, plaintiff argues that WCC has not established that its alleged burden outweighs the public interest in the information requested.  Citing his testimony at the March 2015 evidentiary hearing, plaintiff argues that he was concerned that WCC was not fulfilling the promises that it made to Aurora in spending $45 million on a new campus.  WCC also had various agreements in which Aurora gave it incentives and preferential treatment, and plaintiff

sought to make sure that WCC was acting in Aurora's best interests. He argues that how public funds are spent is consistently deemed a matter of great public importance (see, *e.g.*, *Family Life League v. Department of Public Aid*, 112 Ill. 2d 449, 453 (1986)) and that the burden of a straightforward search of WCC's databases does not outweigh this legitimate public interest.

¶ 44 WCC responds as follows. It contends that the circuit court's order was well reasoned and correct. The circuit court found Felton to be credible, including his testimony that it would take around a week to respond to each of plaintiff's FOIA requests. The court believed that Felton was in a better position than Deligtisch to opine on WCC's databases. Based on Felton's testimony, the court concluded that WCC employees would have to spend in excess of 150 hours, or 20 personnel days, to comply with the requests and that compliance would require overtime pay and might entail hiring additional staff. It also found that plaintiff's interest in obtaining the data was not comparable to the public importance of improving lineup protocols.

¶ 45 WCC continues that *Shehadeh* is controlling authority that supports affirming the circuit court's order. WCC stresses that the circuit court heard testimony over three days at the evidentiary hearing, considered over 100 exhibits, and provided plaintiff adequate opportunity to test and examine WCC's witnesses.

¶ 46 In addition, WCC argues that plaintiff "relies on the argument that somewhere on [its] database, it is possible to find the information he is seeking," ignoring that the Banner database is "complex and handles every major function" at the college.[2] Per Felton's testimony, his staff

---

[2] WCC also argues that its student registration forms "are only maintained in hard copy form and are not scanned" into its databases. It goes on to describe its storage of paper records, citing the testimony of another WCC employee from the evidentiary hearing. It is unclear why WCC is arguing about its physical records here, where only requests for electronic data are at

would have to create a program to respond to each request, and each program would take a week to develop. Moreover, during this week, the staff member would be taken away from regularly assigned duties. Extraction would be complex, and Felton had only two staff members capable of doing it. WCC continues that, if "the programmers were directed to devote themselves entirely to [plaintiff's] FOIA project, it might be possible to take one day to complete each of the requests," but this dedication to a singular task would be "significantly detrimental" to its operations.

¶ 47    WCC next turns to DAISI, arguing that it does not control that database or the data on it. It argues that, "similarly," the Driver Safety database contains information from third parties and that WCC has an obligation to keep much of the students' driver-safety data confidential. WCC suggests that redaction would be necessary, adding to its burden.[3]

¶ 48    Finally, WCC argues that plaintiff's arguments are "unfounded" and that Deligtisch's opinions were not grounded in facts or reasonable inferences. WCC refers to Deligtisch as a "so-called 'expert,' " stressing his lack of personal experience with the Banner and the Driver Safety databases.[4]

¶ 49                       B. Standard of Review

---

issue.

[3] This argument again contemplates searches of physical records that are not at issue in this appeal.

[4] Over WCC's objection, the circuit court accepted Deligtisch as an expert in the field of database analytics and permitted his testimony pursuant to Illinois Supreme Court Rule 702 (eff. Jan. 1, 2011).

¶ 50    A motion to dismiss under section 2-619 admits the legal sufficiency of the plaintiff's claim but asserts certain defects or defenses outside the pleadings that defeat the claim. *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 55.  Generally, our review of a section 2-619 dismissal is *de novo*.  *Davidson v. Gurewitz*, 2015 IL App (2d) 150171, ¶ 9.  In addition, whether an exemption applies under the FOIA is a matter of statutory construction, which as a question of law is reviewed *de novo*.  *Garlick v. Naperville Township*, 2017 IL App (2d) 170025, ¶ 44; see *Nelson v. Kendall County*, 2014 IL 116303, ¶ 22 (reviewing statutory construction of a FOIA definition *de novo* and noting that *de novo* review was also appropriate because the case was dismissed pursuant to section 2-619).

¶ 51    Where the circuit court conducts an evidentiary hearing, as it did here, we review whether the court's factual findings were against the manifest weight of the evidence, while still reviewing questions of law *de novo*.  *Offord v. Fitness International, LLC*, 2015 IL App (1st) 150879, ¶ 15; *Kirby v. Jarrett*, 190 Ill. App. 3d 8, 13 (1989) (following an evidentiary hearing on a section 2-619 motion to dismiss, a reviewing court must review "not only the law but also the facts, and may reverse the trial court order if it is incorrect in law or against the manifest weight of the evidence").  A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the finding itself is unreasonable, arbitrary, or not based on the evidence presented.  *Offord*, 2015 IL App (1st) 150879, ¶ 16.  Accordingly, we will review under the manifest-weight-of-the-evidence standard the circuit court's factual findings in its dismissal order, and we will review *de novo* the ultimate dismissal for a section 3(g) undue burden.

¶ 52                                  C.  Resolution

¶ 53    We agree with plaintiff that the circuit court erred in granting WCC's section 2-619 motion to dismiss.  The parties agreed to proceed on the evidence adduced at the March 2015

evidentiary hearing. After careful review of that evidence, we hold that many of the circuit court's necessary findings in support of its dismissal order were against the manifest weight of the evidence. We explain as follows.

¶ 54 Under the FOIA, "[a]ll records in the custody or possession of a public body are presumed to be open to inspection or copying." 5 ILCS 140/1.2 (West 2016). The FOIA was enacted, in part, to help people make "informed political judgments" and monitor government "to ensure that it is being conducted in the public interest." *Id.* § 1. The FOIA was not, however, intended to unduly burden public resources. *Id.*

¶ 55 Section 3(g) of the FOIA exempts disclosure where (1) a request for all records falling within a category would be unduly burdensome for the complying public body, (2) there is no way to narrow the request, and (3) the burden on the public body outweighs the public interest in the information. *Id.* § 3(g); *National Ass'n of Criminal Defense Lawyers*, 399 Ill. App. 3d at 15. As a threshold matter, section 3(g) requires that the public body extend to the person making the request an opportunity to confer with it in an attempt to narrow the request. *Heinrich v. White*, 2012 IL App (2d) 110564, ¶ 21 (citing 5 ILCS 140/3(g) (West 2010)). Any public body, such as WCC, that asserts that a record is exempt from disclosure "has the burden of proving by clear and convincing evidence that it is exempt." 5 ILCS 140/1.2 (West 2016).

¶ 56 In its dismissal order, the circuit court determined that complying with plaintiff's requests would unduly burden WCC, satisfying the first element of the FOIA's section 3(g) exemption. In reaching its conclusion, it found that Felton was a credible witness and that he was in a superior position to Deligtisch to testify about searching WCC's databases. The circuit court was in the best position to evaluate witness credibility, and we will not substitute our judgment for the circuit court's or reweigh the evidence. See *Sullivan v. Kanable*, 2015 IL App (2d)

141175, ¶ 10 (under the manifest-weight-of-the-evidence standard, a reviewing court will not substitute its judgment for that of the circuit court regarding credibility of witnesses or the weight to be given the evidence). Accordingly there was no error in the circuit court's relying on Felton's testimony over Deligtisch's. Nevertheless, the circuit court had to make findings that were reasonable and based on Felton's actual testimony.

¶ 57 The circuit court's findings on whether plaintiff's requests would unduly burden WCC were not supported by Felton's testimony. We find persuasive plaintiff's argument that WCC's alleged burden was improperly padded with time that staff would spend performing other activities. The record shows that on direct examination Felton's testimony that his staff would take a week to respond to each request was qualified by his explaining that they had other job responsibilities to attend to. These other responsibilities existed prior to and independent of plaintiff's requests. On cross-examination, Felton clarified that the time required to actually respond to each request was about one day. Even assuming a full 8 hours of work per request, it would take only 56 hours to respond to all seven of plaintiff's requests—not "well beyond 150 hours, or 20 personnel days." If the staff spread those hours out over time—for example, by spending one hour per work day responding to plaintiff's requests—they could work on their normal tasks for the rest of the day and it would be more accurate to say that they would spend five hours per week responding to the requests, not that they would spend a whole week. By focusing on the gross time required to respond to each request, the court conflated WCC's alleged burden with its normal operations, unreasonably inflating the impact of the requests. Thus, the court's findings that WCC would take at least a week to respond to each request and that compliance would take "well beyond 150 hours, or twenty personnel days" were not based on the evidence presented.

¶ 58    The circuit court made other findings that were against the manifest weight of the evidence.  Citing WCC's post-remand brief, the circuit court found that plaintiff's requests would require WCC to search databases outside its control, including DAISI.  The record does not support this conclusion and, in fact, clearly supports the opposite conclusion, that WCC would not be required to search databases outside its control.  Felton testified that the data plaintiff requested was available on the Banner and the Driver Safety databases and that his staff could extract the data from those databases.  For the seven FOIA requests relevant to this appeal, Felton's testimony made clear that the data for one request could be extracted from the Driver Safety database (ZIP codes for the students taking the National Safety Council's Defensive Driving Course) and that the data for the other six requests could be extracted from the Banner database.  At no point at the evidentiary hearing did any witness suggest that WCC had to search DAISI to respond to any of the seven requests.  Rather, after WCC's counsel had asked Felton about DAISI on direct examination, plaintiff's counsel asked Felton to clarify where the requested data would come from, in the following exchange:

    "Q:  And you could write a program to extract everything that Mr. Hites is asking for in his FOIA requests out of the Banner system, is that right?

    A:  Well, I would need clarification on the registration question.

    Q:  And once you got clarification on the registration question, you could write a program that would—

    A:  Yes.

    Q:  Provide you with all the information required by Mr. Hites in his FOIA requests?

    A:  It would take a while, but, yes.

Q: And that would all come out of the DAISI database?

A: No.

Q: That would all come out of the Banner database?

A: Yes."

WCC's argument that it would have to search DAISI to respond to plaintiff's requests is simply false. Accordingly, the circuit court's finding that compliance would require a search of databases outside WCC's control was against the manifest weight of the evidence.

¶ 59 In addition, the circuit court found that compliance with the FOIA requests would require WCC to compensate staff for spending several weeks or months responding to the requests and that its costs might include overtime or hiring additional staff. These findings are also unsupported by the record. We have already determined that the record does not support that it would actually take several weeks or months to respond to the requests. During much of that time, staff would simply be performing their normal duties. Further, the only testimony relevant to the costs of the electronic searches at issue here—as opposed to the physical records searches that are no longer at issue—was Felton's response on rebuttal as to whether WCC might incur overtime costs. He responded, "Possibly, yeah," and then explained how his staff would manage the requests by spreading the time spent responding over days or weeks. There was no testimony that compliance would necessarily require additional compensation, let alone how much compensation. And there was no testimony that WCC would hire additional staff to respond to the requests at issue.[5]

--------

[5] The only testimony suggesting that WCC would hire additional staff came from Tracey Petryka, a WCC employee, in the context of a search of physical records. She testified that certain document collection, which would also include redaction, would take two months and

¶ 60 The second element of an undue burden requires that there be no way to narrow the request. 5 ILCS 140/3(g) (West 2016).[6] Here, the circuit found that WCC had complied with the FOIA by responding to plaintiff's requests in writing and offering him an opportunity to narrow his requests. These findings were not against the manifest weight of the evidence, but they go toward the threshold requirement under section 3(g)—that a public body "[b]efore invoking this exemption *** shall extend to the person making the request an opportunity to confer *** to reduce the request to manageable proportions." *Id.* This requirement is not the same as section 3(g)'s requirement that there be no way to narrow the request. See *Heinrich*, 2012 IL App (2d) 110564, ¶¶ 21-22 (explaining that the defendant needed to confer to narrow the request in order to invoke the undue-burden exemption, and then separately explaining the three elements of an undue burden for consideration on remand, including that there be no way to narrow the request). Here, the circuit court made no findings about whether plaintiff's requests could be narrowed, and it was error to conclude that the undue-burden exemption applied absent such findings.

¶ 61 For the third element, the court weighed plaintiff's desire "to speculate about what businesses the students might frequent" against WCC's alleged burden. Not only have we

that WCC would need to hire temporary employees to fill in for staff members helping in the document collection and redaction. As noted, requests for physical records are no longer at issue in this case.

[6] "Requests calling for all records falling within a category shall be complied with unless compliance with the request would be unduly burdensome for the complying public body *and there is no way to narrow the request* and the burden on the public body outweighs the public interest in the information." (Emphasis added.) *Id.*

already determined that the court's findings regarding WCC's burden were against the manifest weight of the evidence—which upsets the court's balancing between the burden and the public interest—but also the court's statement of the public interest is based on a selective and incomplete reading of the record. Before reaching its conclusions, the court correctly cited plaintiff's testimony that he requested the data to determine whether WCC was fulfilling the promises it made following its construction of a new campus; whether WCC was working in Aurora's best interests; whether numerous agreements between WCC and Aurora, in which the city gave WCC incentives and preferential treatment, might need to be reconsidered; and whether Aurora students were being sent to campuses outside Aurora. Yet, in its conclusions, the court identified only one public interest: to learn student demographics in order to speculate about businesses students might frequent.

¶ 62    Our supreme court has made clear that the public has a legitimate interest in how its tax dollars are spent. *Family Life League*, 112 Ill. 2d at 456. Plaintiff testified to interests similar to the public's interest in how tax dollars are spent. He testified that WCC was receiving benefits from Aurora and that, even if those benefits were not direct tax dollars, Aurora's preferential treatment of WCC came with public opportunity costs. We also note that plaintiff testified that Aurora Downtown received tax proceeds for its oversight. Therefore, any "speculation" about businesses was not about simply the businesses but about pursuing the committee's publicly funded mission to better downtown Aurora. Promoting local business and economic development would be a logical component of the committee's mission. Furthermore, in the persuasive Drumm opinion cited by the circuit court, there was a "significant public interest" in the disclosure of communications between the city manager, whose work had a "focus on the long term objectives regarding the City's future," and the private firm the city hired to assist in

several redevelopment projects. 2016 Ill. Att'y Gen. Op. No. 16-008, at 7-8, http://foia.ilattorneygeneral.net/pdf/opinions/2016/16-008.pdf. Plaintiff testified similarly that he sought the data to help determine whether WCC's new campus was benefitting Aurorans and whether its agreements with the city might need to be reconsidered. That is, he was interested in whether the campus development in downtown Aurora was serving Aurora's best interests. Thus, limiting the public interest to speculation on local business development was not supported by the record.

¶ 63    In summary, the circuit court's findings as to the first and third elements of an undue burden were against the manifest weight of the evidence, and it failed to make a necessary finding related to the second element. While reversal is appropriate based on the erroneous factual findings (see *Offord*, 2015 IL App (1st) 150879, ¶ 15 (reversal is appropriate if an order is incorrect in law or against the manifest weight of the evidence)), we also do not believe that the record supported dismissal for an undue burden. In particular, we do not believe that the burden on WCC outweighed the public interest in the data.

¶ 64    We first note that this case is readily distinguishable from *Shehadeh*, the one case the circuit court cited that found an undue burden. In *Shehadeh*, the AG's office would have had to review 9200 documents by hand in order to determine which of those documents were responsive to plaintiff's request for " 'copies of any publications, opinions, reports or other records that would or could be used for guidance by [the AG's] office or any other public body in complying with Illinois' FOIA laws.' " *Shehadeh*, 2013 IL App (4th) 120742, ¶¶ 5, 34. Then, after determining which documents were responsive, it would have had to identify and redact exempt information from those documents. *Id.* ¶ 34. The *Shehadeh* court held that this burden on the AG's office satisfied section 3(g), and it also determined that the plaintiff's FOIA request

was "patently broad on its face, as it sought *any* publication or record that would or could be used by *any* public body to comply with Illinois's FOIA provisions." (Emphasis in original.) *Id.* ¶¶ 28, 34. Here, plaintiff's FOIA requests were for specific datasets from the Banner and the Driver Safety databases and did not involve any hand review or redaction. Having a staff member electronically search for a narrow dataset, such as the ZIP codes of students from a specific year and class, is simply not comparable to the burden of physically reviewing over 9000 documents for general guidance on complying with the FOIA.

¶ 65 A FOIA request that is "overly broad and requires the public body to locate, review, redact and rearrange for inspection a vast quantity of material that is largely unnecessary to the [requestor's] purpose" constitutes an undue burden. *National Ass'n of Criminal Defense Lawyers*, 399 Ill. App. 3d at 17. In *National Ass'n of Criminal Defense Lawyers*, the court reversed a grant of summary judgment in favor of the defendant, the Chicago Police Department (CPD), denying the plaintiff's requests for certain data, files, and photographs. *Id.* at 17-18. The court noted that the CPD did not have to access every document in its files and that the plaintiff's request specifically targeted the files relevant to its study of mistaken identification. *Id.* at 17. The court concluded that " 'several weeks of full-time work by [CPD] personnel who need to possess a high level of knowledge and sophistication' " was not sufficiently burdensome to outweigh the public interest in the plaintiff's study of wrongful convictions based on mistaken eyewitness identification. *Id.* at 15, 17.

¶ 66 Moreover, the FOIA evinces a public policy in favor of disclosure, and exceptions to disclosure are to be read narrowly. 5 ILCS 140/1 (West 2016). Records are presumed to be open, and the public body has the burden of proving by clear and convincing evidence that the data sought is exempt from disclosure. *Id.* § 1.2. With this in mind, the burden on WCC staff to

extract the requested data does not outweigh the public interest in the requested information. On the one hand, the burden here is less than the burden in *National Ass'n of Criminal Defense Lawyers* or *Shehadeh*. Compliance would not require several weeks of full-time work, nor would anyone have to spend time redacting files. Plaintiff's requests targeted specific sets of data, and the record supports that the requests could be completed by one person in, at most, seven days of actual work. WCC's arguments that database extraction is "complex" and that compliance would be "significantly detrimental" to its operations are conclusory and fall short of the clear and convincing evidence necessary to support a FOIA exemption. On the other hand, the public has a legitimate interest in how WCC is benefitting the community in which it operates and from which it receives benefits. Similar to the significant public interest in the Drumm opinion, plaintiff testified that he seeks the disclosures to help determine whether WCC's new Aurora campus is serving Aurora and its students. See 2016 Ill. Att'y Gen. Op. No. 16-008, at 7-8, http://foia.ilattorneygeneral.net/pdf/opinions/2016/16-008.pdf (finding significant public interest in public official's communications with private firm related to city redevelopment projects). He testified that Aurora and WCC had "numerous agreements," that WCC received benefits and preferential treatment from Aurora, and that he worried that Aurora students were being sent to campuses outside Aurora. In addition, plaintiff was a part of Aurora Downtown, which received public funds to promote the interests of Aurora, and his role with the oversight committee spurred his FOIA requests. Therefore, the burden does not outweigh the public interest in the information, and WCC did not satisfy the requirements for an undue-burden exemption.

¶ 67                                    III. CONCLUSION

¶ 68    The circuit court erred in granting WCC's section 2-619 motion to dismiss plaintiff's complaint, based on the FOIA's section 3(g) undue-burden exemption.  Its findings on the necessary elements of an undue burden were either absent or against the manifest weight of the evidence.  In addition, the record did not support that WCC's burden of compliance with plaintiff's FOIA requests outweighed the public interest in the information.  Therefore, we reverse the judgment of the Kane County circuit court and remand for proceedings consistent with this opinion.

¶ 69    Reversed and remanded.