2018 IL App (1st) 181323

No. 1-18-1323

Fourth Division
December 20, 2018

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| THE FOREST PRESERVE DISTRICT OF COOK COUNTY, | ) ) ) | |
| | ) | Appeal from the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | No. 18 L 315 |
| | ) | |
| ROYALTY PROPERTIES, LLC; CANNON | ) | The Honorable |
| SQUIRES PROPERTIES, LLC; RICHARD KIRK | ) | Margaret Ann Brennan, |
| CANNON; and MERYL SQUIRES CANNON, | ) | Judge Presiding. |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    The instant appeal arises from the trial court's entry of an order appointing a receiver during the pendency of a foreclosure action. The trial court initially granted summary judgment in the foreclosure action in favor of plaintiff Forest Preserve District of Cook County (Forest Preserve), but we reversed that judgment on appeal, finding that there were questions of fact concerning the validity of defendants' affirmative defenses. *BMO Harris Bank, N.A. v. Royalty Properties, LLC*, 2016 IL App (1st) 151338-U. On remand, the trial court entered an order finding the Forest Preserve mortgagee in possession pursuant to the

Illinois Mortgage Foreclosure Law (Foreclosure Law) (735 ILCS 5/15-1101 *et seq.* (West 2008)). On appeal, we again vacated that order, finding that, without an evidentiary hearing, the trial court did not have an adequate basis for finding the Forest Preserve as mortgagee in possession. *Forest Preserve District v. Royalty Properties, LLC*, 2017 IL App (1st) 171564-U. After remand, the trial court held an evidentiary hearing, after which it granted the appointment of a receiver. For the reasons that follow, we affirm.

¶ 2                                          BACKGROUND[1]

¶ 3         The underlying real estate transaction involved in the instant appeal has been the subject of extensive litigation, both before this court and in federal court.[2] In the instant appeal, we are asked to consider the limited question of whether the trial court properly found the Forest

---

[1] As an initial matter, we must note the serious deficiencies with the record filed in the instant appeal. Defendants electronically filed their 1459-page record in the form of 75 separate pdf files, none of which contain any numbering to indicate their proper order within the record. Additionally, despite defendants' claim that they included all of the Forest Preserve's evidentiary hearing exhibits in the record on appeal, the record as filed contains only 6 of the 46 exhibits, which required the Forest Preserve to file a supporting supplemental record to provide those documents, over defendants' objection. Most problematically, the appendix to the record on appeal is inaccurate, claiming that documents are part of the record when they are not—as one example, defendants' record on appeal states that all 46 of the Forest Preserve's exhibits are included. While this court has reviewed the record as filed, we must note that the issues with the record have caused this court to expend substantial time and effort to untangle in order to come to an understanding of the relevant facts before us.

[2] There have been four separate lawsuits before this court concerning the underlying real estate transaction, which have resulted in six decisions by this court, with the instant order becoming the seventh. First, defendants Richard Cannon and Meryl Squires Cannon were plaintiffs in a taxpayer action against the Forest Preserve concerning its authority to acquire title to the property. *Baker v. Forest Preserve District*, 2015 IL App (1st) 141157. Next, defendants litigated the foreclosure of the primary mortgage on the property, leading to appeals in (1) *BMO Harris Bank, N.A. v. Royalty Properties, LLC*, 2016 IL App (1st) 151338-U, (2) *Forest Preserve District v. Royalty Properties, LLC*, 2017 IL App (1st) 171564-U, and (3) the instant appeal. While the foreclosure action was pending, defendant Royalty Farms, LLC, filed a separate action against the Forest Preserve, alleging that the Forest Preserve breached the duties it assumed as a landlord when it purchased the farm. *Royalty Farms, LLC v. Forest Preserve District*, 2017 IL App (1st) 161409. Finally, defendants have litigated the attempts to collect on the junior note on the property, leading to appeals in (1) *McGinley Partners, LLC v. Royalty Properties, LLC*, 2018 IL App (1st) 171317, *appeal denied*, No. 124085 (Ill. Nov. 28, 2018); and, most recently, in (2) *McGinley Partners, LLC v. Royalty Properties, LLC*, 2018 IL App (1st) 172976. There have also been at least three federal lawsuits, the most recent of which was considered by the Seventh Circuit in July 2018. See *Cannon v. Forest Preserve District*, No. 13 C 6589, 2014 WL 1758475 (N.D. Ill. May 2, 2014); *Squires-Cannon v. White*, 864 F.3d 515 (7th Cir. 2017); *Squires-Cannon v. Forest Preserve District*, 897 F.3d 797 (7th Cir. 2018).

Preserve as mortgagee in possession during the pendency of foreclosure proceedings and the trial court's appointment of a receiver. Accordingly, we are primarily concerned with the litigation directly affecting that question and consider the ancillary lawsuits only where necessary to provide context.

¶ 4     As noted in our prior decisions, on June 8, 2009, Amcore Bank[3] (Amcore) filed a complaint for foreclosure against defendants Richard Cannon and Meryl Squires Cannon (collectively, the Cannons), Royalty Properties, LLC (Royalty Properties), and Cannon Squires Properties, LLC (Cannon Squires Properties), seeking possession of a 400-acre property in Barrington Hills that was used as a horse farm. Defendants filed an answer to the complaint and several affirmative defenses, including (1) that Amcore had acted in bad faith by failing to send the loan documents to defendants until the night before the closing, (2) that the loan violated the Truth in Lending Act (TILA) (15 U.S.C. § 1601 *et seq.* (2012)), (3) that Amcore's unclean hands barred it from foreclosing, (4) that Amcore's promises estopped it from foreclosing, and (5) that Amcore miscalculated the amount due. The trial court dismissed the affirmative defenses but gave defendants leave to replead them. On May 18, 2010, the trial court appointed a receiver for the property.

¶ 5     In 2010, during the pendency of the lawsuit, the federal Office of the Comptroller of the Currency determined that Amcore was engaging in unsafe business practices that were likely to cause insolvency and appointed the FDIC as receiver for Amcore's assets. As receiver, the FDIC sold Amcore's interest in the loan to BMO Harris Bank (BMO Harris), which took over the foreclosure action. BMO Harris filed a motion for summary judgment on the complaint, but before the trial court heard the motion, BMO Harris sold its interest in the

_____

[3] As we explain in more detail below, Amcore's interest in the loan was sold to BMO Harris Bank in 2010, which, in turn, sold its interest in the loan to the Forest Preserve in June 2013.

loan to the Forest Preserve, which was granted leave to substitute as plaintiff. After the Forest Preserve was substituted as plaintiff, defendants filed a motion requesting leave to file amended affirmative defenses, including the previous defenses as well as additional defenses specific to the Forest Preserve. In August 2013, the trial court denied defendants' motion for leave to file their amended affirmative defenses, granted summary judgment in favor of the Forest Preserve, and granted the foreclosure of the mortgage and sale of the farm. The Forest Preserve was the highest bidder at the foreclosure sale, and the trial court entered a $6.2 million deficiency judgment against defendants.

¶ 6 Defendants appealed and we reversed, finding that defendants had adequately alleged facts that could support judgment in their favor and that there remained questions of material fact precluding entry of summary judgment. *BMO Harris Bank*, 2016 IL App (1st) 151338-U, ¶ 71. Specifically, we noted that defendants had alleged (1) that Amcore had only presented them with the 500 pages of closing documents the night before the closing, (2) that Amcore knew that they needed to close or forfeit their nearly $2 million escrow deposit, and (3) that some of the loan documents provided by Amcore contained terms different than those previously discussed. *BMO Harris*, 2016 IL App (1st) 151338-U, ¶¶ 10, 47. We found that "[t]he allegation that the Cannon parties would lose their entire deposit of almost $2 million if they walked away from the deal, when they had an inadequate opportunity to review the loan documents or arrange alternate financing, suffices to state a claim for economic duress that violated Amcore's duties of negotiating in good faith and dealing fairly with the Cannons." *BMO Harris*, 2016 IL App (1st) 151338-U, ¶ 48.

¶ 7 Additionally, we found that defendants adequately alleged facts to support a violation of TILA. *BMO Harris*, 2016 IL App (1st) 151338-U, ¶ 52. We noted that TILA applies only to

consumer loans, not to loans for commercial purposes, and that the trial court had found that the loan documents established that Amcore made a commercial loan. *BMO Harris*, 2016 IL App (1st) 151338-U, ¶ 51. We further noted that defendants had presented evidence that the Cannons had intended to use the property as a residence and that there were zoning regulations and easements that severely limited the use of the land and largely forbade commercial use of the property. *BMO Harris*, 2016 IL App (1st) 151338-U, ¶ 52. We found that "[t]he circuit court improperly focused on Amcore's purpose in making the loan, when applicable case law requires the court to consider primarily 'the borrower's purpose in obtaining the loan.' " *BMO Harris*, 2016 IL App (1st) 151338-U, ¶ 52 (quoting *People's Bank of Arlington Heights v. Atlas*, 2015 IL App (1st) 133775, ¶ 28). Accordingly, we found that defendants had adequately alleged facts to raise a question of fact as to whether TILA applied to the loan transaction. *BMO Harris*, 2016 IL App (1st) 151338-U, ¶ 52. We reversed the trial court's grant of summary judgment and its decision to strike defendants' affirmative defenses and remanded "for further proceedings in accord with this order." *BMO Harris*, 2016 IL App (1st) 151338-U, ¶ 71.

¶ 8    After remand, on May 30, 2017, the parties appeared before the trial court to reinstate the case, and defendants requested that possession of the property be returned to them. The parties discussed the "status quo" that had been in place prior to the entry of summary judgment, with defendants arguing that possession remained presumptively with them because there was no showing that the property was nonresidential. The trial court found that, prior to the entry of summary judgment, there had been an order finding the Forest Preserve as mortgagee in possession and appointing a receiver and that the status quo would be continuing with the Forest Preserve as mortgagee in possession. The trial court accordingly

entered an order providing that "the Plaintiff Forest Preserve District of Cook County is mortgagee in possession, pursuant to the October 10, 2013 ORDER, which is now reinstated." Defendants again appealed to this court, and we again vacated the order. *Forest Preserve District v. Royalty Properties, LLC*, 2017 IL App (1st) 171564-U. We noted that, in the prior appeal, "[t]he appellate court expressly held that the Cannon parties stated several viable affirmative defenses supported by sufficient evidence to withstand the motion for summary judgment. The appellate court found that the Cannon parties stated facts which could support a finding that fraud in the factum rendered the purported mortgage documents void." *Forest Preserve District*, 2017 IL App (1st) 171564-U, ¶ 7. We found that the questions of fact surrounding the validity of the mortgage precluded the trial court from finding the Forest Preserve as mortgagee in possession. *Forest Preserve District*, 2017 IL App (1st) 171564-U. Specifically, we found:

> "The Cannon parties' allegations in their affirmative defenses, on which the circuit court has heard no testimony, would support a finding that no written instrument created a 'consensual lien,' because Amcore obtained the Cannons' signatures on the purported mortgage through fraud or duress. Because the circuit court has not yet heard sufficient evidence to determine whether the document [the Forest Preserve] presented meets the statutory definition of 'mortgage,' and whether Amcore and those who derive their rights from Amcore qualify as mortgagees, the circuit court did not have an adequate basis for naming [the Forest Preserve District] as mortgagee in possession." *Forest Preserve District*, 2017 IL App (1st) 171564-U, ¶ 15.

6

Accordingly, we found that "the record does not yet permit the circuit court to designate [the Forest Preserve] as a mortgagee in possession of the property at issue" and vacated the order, remanding "for further proceedings in accord with this order." *Forest Preserve District*, 2017 IL App (1st) 171564-U, ¶ 17.

¶ 9 On September 7, 2017, the Forest Preserve filed a motion to set an evidentiary hearing on its motion to be named mortgagee in possession. On October 23, 2017, the Forest Preserve filed a motion to reinstate a receiver, arguing that the original order appointing a receiver had never been appealed and that the appellate court decisions did not concern receivership. On October 31, 2017, McGinley Partners, LLC (McGinley Partners), holder of the junior note and mortgage on the property, also filed a motion to reinstate the receiver or, in the alternative, to appoint a receiver, arguing that a receiver should be appointed because McGinley Partners had obtained a judgment against defendants for failure to repay the junior note.[4]

¶ 10 On November 27, 2017, defendants filed a response in opposition to the motions to appoint a receiver, arguing that, at the time the original order appointing a receiver was entered, defendants had not yet alleged their affirmative defense of duress. Defendants claimed that they did not immediately appeal this order because the receiver entered into a management agreement with them, which permitted their management and exclusive occupancy of the property. Defendants argued that the Forest Preserve had the burden of establishing (1) whether the property was residential real estate, (2) whether the Forest Preserve had an enforceable mortgage, and (3) whether there was good cause to appoint a

---

[4] We affirmed the trial court's judgment with respect to the junior note in *McGinley Partners, LLC v. Royalty Properties, LLC*, 2018 IL App (1st) 171317, *appeal denied*, No. 124085 (Ill. Nov. 28, 2018).

receiver. Defendants further argued that the Forest Preserve had failed to satisfy its burden, so appointment of a receiver should be denied.

¶ 11    In reply, the Forest Preserve argued that defendants had affirmatively represented that they had leased the property to another business entity, Royalty Farms, LLC, for a commercial horse farm operation, demonstrating that the property was not residential. The Forest Preserve also claimed that defendants had not demonstrated that they were "good stewards" of the property, as they were unable to pay any of the costs associated with owning the property, including the payment of real estate property taxes.

¶ 12    On May 8 and 9, 2018, the parties appeared before the trial court for an evidentiary hearing, and on May 25, 2018, the trial court entered a nine-page order granting the appointment of a receiver. The court first noted that the requirements for naming a mortgagee in possession and appointing a receiver depended on the characterization of the property as residential or nonresidential property. The court found that, at the evidentiary hearing, the Cannons claimed that they intended to make Hunt Ridge, the largest residence on the property, their primary residence, and that at least defendant Richard Cannon did so; the trial court also found that the Forest Preserve "did not meaningfully dispute the fact that one or both of the Cannons resided at Hunt Ridge." However, the court noted that "simply residing on the Property does not make it residential," as a single tract of agricultural real estate consisting of more than 40 acres was not considered residential property under the statute.

¶ 13    The court found that, at the hearing, the Cannons admitted that they at one point had 54 horses on the property and grew hay in some of the fields, and also admitted to employing at least 11 people to maintain the property and horses. The court further found that, according to a brochure published by Horizon Farms, the prior owner of the property, "the Property

consisted of Hunt Ridge, a guest house, a farm house, a duplex staff house, a bunk house, staff apartment building, race track, hunter jumper area, jumper trail, run in shed, dog kennel, workshop, at least nine barns, at least six pastures, and at least nineteen paddocks"; the property also had breeding equipment and facilities. The court noted that, at the time defendants purchased the property, there were approximately 11 people leasing facilities; the court found that, by the time the foreclosure commenced, there were only two lessees remaining. However, the court noted that defendants had also leased the property to Royalty Farms, LLC, the entity the Cannons had created to manage their horses. The court found:

> "All of this taken together demonstrates that the Property was used predominantly for the growing and harvesting of hay; and the feeding, breeding, and management of horses. As such, the Property was clearly agricultural in nature. Indeed, all of the witnesses including the Cannons referred to the Property as either Horizon or Royalty Farms. While the Cannons argue that they did not intend to operate a commercial or for-profit farm, the statute does not require that agricultural property be operated for profit, merely that the predominate [*sic*] use of the land is agricultural. 735 ILCS 5/15-1201. Finally, the Property is a single contiguous 400-acre tract of land, well over the statutory 40 acres.
>
> As such, the Court finds that the Property in question was a single tract of agricultural real estate larger than 40 acres, and thus does not meet the statutory definition of residential property."[5]

---

[5] We note that, although the record does not make it entirely clear, it appears that the property was zoned as residential under the Barrington Hills zoning code. However, "[a]griculture" is specified as a permitted use in residential districts (Barrington Hills Village Code § 5-5-2 (amended Dec. 7, 2016)) and the zoning code does not contain a separate zoning district for agricultural use (see Barrington Hills Village Code § 5-4-1 (added Apr. 1, 1963) (defining zoning districts)). Since the trial court did not use the

¶ 14    As such, the trial court noted that, in order to name a mortgagee in possession or appoint a receiver, (1) it must be authorized by the mortgage and (2) there must be a reasonable probability that the mortgagee will prevail on a final hearing on the case, unless (3) the mortgagor objects and can show good cause. The court found that the mortgage permitted the mortgagee to take possession or obtain appointment of a receiver and proceeded to consider whether defendants' affirmative defenses showed that there was no consensual mortgage. We discuss only the court's analysis of issues that are raised by defendants on appeal.

¶ 15    With respect to the TILA claims, the court found that the statute applied to consumer credit transactions and that, "[u]nder the loan documents," Royalty Properties and Cannon Squires Properties were the borrowers, so no credit was extended to any natural persons "and this defense fails as a matter of law."

¶ 16    With respect to defendants' claims of economic duress, the trial court identified the following allegations of wrongful conduct: (1) that Amcore provided "strong verbal tentative approval" of the loan prior to the Cannons' bid on the property, (2) that Amcore failed to provide the loan documents until the evening before the closing, (3) that Amcore refused to change the documents to conform with prior representations regarding the terms of the loan, and (4) that Amcore demanded that the Cannons assign the purchase agreement to Royalty Properties.

¶ 17    First, the court found that the only evidence concerning any representations made by Amcore prior to the Cannons' bid on the property was provided by the testimony of defendant Meryl Squires Cannon, who testified that she had conversations with an Amcore

_____

zoning of the property in its analysis, and the parties equally do not argue the zoning of the subject property, we also will not consider the zoning in our analysis.

representative in October 2006 both over the telephone and in person at the property. The trial court found that this testimony "is self-serving and is corroborated by no one."

¶ 18    Next, the court found that Scott Gudmunson testified that he began working on the loan documents on December 15, 2006, and that the closing date was set for December 21, 2006; the court found that all the witnesses agreed that the closing date was set by the seller, not by the Cannons or Amcore. The court found that Gudmunson testified that he and the Cannons' attorney "worked essentially non-stop" in order to have the documents ready by the closing date and that an email from Gudmunson to the Cannons' attorney showed that revisions were being made as late as 2:40 a.m. on December 21. The trial court found that "the loan documents did not exist prior to the closing, so it could not have been wrongful for Amcore to fail to provide documents it did not have."

¶ 19    Additionally, the court found that defendant Richard Cannon had testified to several oral objections he had made to the terms of the loan at the closing but that Amcore was unwilling to negotiate most of the objected terms. The court further found that, after the closing, he continued to dispute an interest calculation issue but made no other objections. The court found:

> "Upon consideration the Court finds that the Cannons would be unlikely to convince a jury that this activity was fraudulent or wrongful. Amcore did not impose the December 21, 2006 closing date on the Cannons, nor did it force them to put up nearly $2,000,000 dollars in earnest money. Indeed, it is this Court's impression that Amcore went to great lengths to provide the Cannons with a $14,500,000 loan before the closing date so that they would not lose their earnest money. Further, Mrs. Cannon testified that the Cannons held a party at Hunt Ridge shortly after the closing

11

to celebrate buying the property and invited the Amcore bankers. Hardly, the behavior of someone brow beaten into a contract against their will. Finally, it is unclear to this Court why it was wrongful to require the Cannons to assign the Purchase Agreement to Royalty Properties."

¶ 20      Finally, the trial court found that there was no good cause for not naming the Forest Preserve as mortgagee in possession or appointing a receiver. The court noted that defendants claimed that the Forest Preserve had improperly maintained the property, but found that the photographs submitted by defendants did not show that the property was in disrepair. The court further found that the photographs could not prove conclusively who was responsible for the current state of the property, "as it has changed hands several times over the course of this lawsuit." Finally, the court found that "the Court does not believe that the Cannons would be able to maintain the Property any better than the Forest Preserve. The Property is 400 acres and contains multiple barns and residences, and the Cannons have not demonstrated that they are in a position to hire the number of staff required to maintain such a complex property."

¶ 21      The court concluded:

> "Based upon the initial review and interpretation of the documentary and testimonial evidence and after having weighed the submissions of the parties, the Court concludes that the Forest Preserve is reasonably likely to prevail on a final hearing of this action. The Court does not believe that the Cannons have established a good cause objection to the appointment of either a mortgagee-in-possession or receiver, so that they should be allowed to remain in possession of the Property. Accordingly, the order of May 18, 2010 appointing a receiver (which order the

Cannons never moved to appeal) is hereby reinstated with Mary B. Grossman of V & G Property Management as receiver. Accordingly, as the motion to reinstate the appointment of a receiver has been granted, the motion to reinstate the October 10, 2013 order appointing the Forest Preserve as mortgagee in possession is denied."

¶ 22                                                    ANALYSIS

¶ 23        On appeal, defendants claim that the trial court erred in appointing a receiver to manage the property. As an initial matter, we must determine the appropriate standard of review for our analysis, as the parties disagree on the applicable standard of review, with defendants arguing for a *de novo* review and the Forest Preserve arguing for a deferential standard of review. Generally, a motion to appoint a receiver pursuant to the Foreclosure Law is reviewed *de novo*, at least where it does not involve an evidentiary hearing. *Bank of America, N.A. v. 108 N. State Retail LLC*, 401 Ill. App. 3d 158, 165 (2010). However, in the case at bar, the receiver was appointed after an evidentiary hearing, and the trial court's order required it to make findings of fact concerning, *inter alia*, the proper characterization of the property. Where a trial court hears witness testimony and makes findings of fact based on such testimony, a reviewing court generally affords deference to the trial court's superior position. See, *e.g.*, *Hites v. Waubonsee Community College*, 2018 IL App (2d) 170617, ¶ 51 (in reviewing a motion to dismiss following an evidentiary hearing, reviewing factual findings under manifest weight standard); *Lurie v. Wolin*, 2017 IL App (1st) 161571, ¶ 32 (in reviewing jurisdictional issue after an evidentiary hearing, reviewing factual findings under manifest weight standard); *Uptown Federal Savings & Loan Ass'n of Chicago v. Kotsiopoulos*, 105 Ill. App. 3d 444, 451 (1982) (in reviewing petition to vacate judgment, reviewing factual findings under manifest weight standard); see also *Bank of America*, 401

Ill. App. 3d at 165 (noting that "it is foreseeable that in a case in which a trial court has held a full evidentiary hearing on a motion to appoint a receiver, this court could find that an abuse of discretion standard or a manifest weight of the evidence standard would be appropriate to review the lower court's judgmental decision"). In the case at bar, accordingly, we review the trial court's factual findings under a manifest weight of the evidence standard of review, while reviewing the ultimate question of the propriety of the receiver's appointment *de novo*. *De novo* consideration means we perform the same analysis that a trial judge would perform (*Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011)), while a finding is against the manifest weight of the evidence "only if the opposite conclusion is clearly evident or the finding itself is unreasonable, arbitrary, or not based on the evidence presented" (*Hites*, 2018 IL App (2d) 170617, ¶ 51).

¶ 24    Defendants first claim that the trial court erred in finding that the property was not residential under the Foreclosure Law. The determination of whether property is residential or nonresidential has a direct impact on the appointment of a receiver, as it dictates which party bears the burden of proof of establishing "good cause" under the Foreclosure Law. Under section 15-1701(b) of the Foreclosure Law, prior to the entry of a judgment of foreclosure,

> "(1) In the case of residential real estate, the mortgagor shall be entitled to possession of the real estate except if (i) the mortgagee shall object and show good cause, (ii) the mortgagee is so authorized by the terms of the mortgage or other written instrument, and (iii) the court is satisfied that there is a reasonable probability that the mortgagee will prevail on a final hearing of the cause, the court shall upon request place the mortgagee in possession. ***

"(2) In all other cases, if (i) the mortgagee is so authorized by the terms of the mortgage or other written instrument, and (ii) the court is satisfied that there is a reasonable probability that the mortgagee will prevail on a final hearing of the cause, the mortgagee shall upon request be placed in possession of the real estate, except that if the mortgagor shall object and show good cause, the court shall allow the mortgagor to remain in possession." 735 ILCS 5/15-1701(b) (West 2008).

In other words, in both cases, the trial court must find authorization in the mortgage and a reasonable probability that the mortgagee will prevail, but if the property is residential under the Foreclosure Law, the mortgagor presumptively retains possession unless the mortgagee shows good cause, while if the property is nonresidential, the mortgagee presumptively has the right of possession unless the mortgagor shows good cause.

¶ 25    "Residential Real Estate" is defined under the Foreclosure Law as

"any real estate, except a single tract of agricultural real estate consisting of more than 40 acres, which is improved with a single family residence or residential condominium units or a multiple dwelling structure containing single family dwelling units for six or fewer families living independently of each other, which residence, or at least one of which condominium or dwelling units, is occupied as a principal residence *** (iii) if a mortgagor is a corporation, by persons owning collectively at least 50 percent of the shares of voting stock of such corporation or by a spouse or descendants of such persons. The use of a portion of residential real estate for non-residential purposes shall not affect the characterization of such real estate as residential real estate." 735 ILCS 5/15-1219 (West 2008).

¶ 26    In the case at bar, the trial court found that the property was not residential real estate because it was a single tract of agricultural real estate consisting of more than 40 acres. "Agricultural Real Estate" is

> "real estate which is used primarily (i) for the growing and harvesting of crops, (ii) for the feeding, breeding and management of livestock, (iii) for dairying, or (iv) for any other agricultural or horticultural use or combination thereof, including without limitation, aquaculture, silviculture, and any other activities customarily engaged in by persons engaged in the business of farming." 735 ILCS 5/15-1201 (West 2008).

The trial court found that the Cannons kept a number of horses on the property—at one point 54—and grew hay in some of the fields, and also employed at least 11 people to maintain the property and horses. The trial court also found important the extensive grounds and facilities on the property, including guest and staff houses, a race track, at least nine barns and six pastures, and at least 19 paddocks, in addition to breeding equipment and facilities. The court found that "[a]ll of this taken together demonstrates that the Property was used predominantly for the growing and harvesting of hay; and the feeding, breeding, and management of horses. As such, the Property was clearly agricultural in nature." We cannot find this factual finding to be against the manifest weight of the evidence.

¶ 27    Defendants focus heavily on the fact that the Barrington Hills zoning code permits the boarding of horses as a residential use. However, the fact that the village zoning code defines the boarding of horses as a "permitted home occupation" does not imply that the keeping of horses is necessarily part of a property's residential character. Indeed, the breeding and raising of horses is also included in the village's definition of agriculture. See Barrington Hills Village Code § 5-2-1 (amended Dec. 7, 2016). Moreover, the village's characterization

of the activity does not control its categorization under the Foreclosure Law. Agricultural real estate is specifically defined to include real estate used primarily for, *inter alia*, "the feeding, breeding and management of livestock." 735 ILCS 5/15-1201 (West 2008). It is axiomatic that "[h]orses are livestock." *Tuftee v. County of Kane*, 76 Ill. App. 3d 128, 133 (1979). Thus, it was not inappropriate for the court to take this use into consideration in determining the nature of the property.

¶ 28    We are similarly unpersuaded by defendants' claim that the covenants, conditions, restrictions, and easements prohibit nonresidential uses of the property. The documents cited by defendants clearly reference the property's long history as a "horse farm." Indeed, the conservation easement incorporated into the covenants, conditions, and restrictions expressly provides that

> "Grantor wishes to preserve the natural, open space, and scenic elements of Horizon Farms and to ensure that it may continue to be used for farming purposes, including the cultivation of the soil, raising and harvesting agricultural commodities, and the raising, shearing, feeding, caring for, training, and management of animals."

We see nothing in these documents that would restrict an agricultural use of the property.

¶ 29    Defendants also argue that none of the agricultural uses pointed to by the trial court "change the residential character of property." However, defendants are beginning from the wrong end of the analysis—property is considered residential only if it is *not* agricultural. Agricultural uses do not "take away" the residential character of the property. The property was never residential in the first place *because* it was agricultural. In the case at bar, the trial court found that the property was properly characterized as "a single tract of agricultural real estate consisting of more than 40 acres," making it, by definition, nonresidential. 735 ILCS

17

5/15-1219 (West 2008). We cannot find that this factual finding was against the manifest weight of the evidence.

¶ 30    Defendants also accuse the trial court of focusing on whether the loan was a residential or commercial loan in finding that the property was nonresidential. However, in the trial court's order, the court did no such thing. As noted, the trial court discussed a number of facts that led it to conclude that the property was agricultural, not residential, in character. None of the facts included in the trial court's analysis on this point included anything about the character of the loan. Similarly, contrary to defendants' contentions, the trial court did not overlook the Cannons' testimony about their making the property their primary residence. Instead, the court accurately noted that "simply residing on the Property does not make it residential," as a single tract of agricultural real estate consisting of more than 40 acres was not considered residential property under the statute. We can find no error in the trial court's analysis on this issue.

¶ 31    Since the property was nonresidential, under the Foreclosure Law, "if (i) the mortgagee is so authorized by the terms of the mortgage or other written instrument, and (ii) the court is satisfied that there is a reasonable probability that the mortgagee will prevail on a final hearing of the cause, the mortgagee shall upon request be placed in possession of the real estate, except that if the mortgagor shall object and show good cause, the court shall allow the mortgagor to remain in possession." 735 ILCS 5/15-1701(b)(2) (West 2008).  In the case at bar, defendants state in their brief that they do not challenge any of the findings of fact made by the trial court. Instead, they argue that the trial court erred in not following the dictates of our prior appeals and in considering the merits of their affirmative defenses. We do not find these arguments persuasive.

¶ 32　　　　In the case at bar, the two elements required for a mortgagee to take possession of the property—its authorization under the mortgage and the reasonable probability of success on the merits—are interrelated. In our most recent appeal, we found that defendants' allegations concerning the circumstances surrounding the execution of the loan documents presented a question of fact as to the validity of the mortgage itself, and that, "[b]ecause the circuit court has not yet heard sufficient evidence to determine whether the document [the Forest Preserve] presented meets the statutory definition of 'mortgage,' and whether Amcore and those who derive their rights from Amcore qualify as mortgagees, the circuit court did not have an adequate basis for naming [the Forest Preserve] as mortgagee in possession." *Forest Preserve District*, 2017 IL App (1st) 171564-U, ¶ 15. Thus, in conducting its evidentiary hearing, the trial court necessarily needed to consider the merits of defendants' affirmative defenses.

¶ 33　　　　Defendants rely heavily on the fact that, in our prior decisions, we found that they had sufficiently alleged facts to withstand the striking of their affirmative defenses and had raised questions of material fact sufficient to withstand a motion for summary judgment. However, those prior decisions involved entirely different burdens than are present in the case at bar. When the legal sufficiency of a pleading is challenged, all well-pleaded facts are taken as true and the court must determine whether the allegations, taken in the light most favorable to the nonmovant, are sufficient to establish a cause of action. *U.S. Bank Trust National Ass'n v. Lopez*, 2018 IL App (2d) 160967, ¶ 17. Similarly, in deciding a motion for summary judgment, the trial court must view the documents and exhibits in the light most favorable to the nonmoving party, and summary judgment may only be granted if there is no general issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Home*

*Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). In other words, with respect to either a motion to strike an affirmative defense or a motion for summary judgment, there is no weighing of the *strength* of the nonmovant's allegations, but only a determination that there is a question of fact that would entitle the case to move forward.

¶ 34    By contrast, the Foreclosure Law expressly requires the trial court to determine whether there is a "reasonable probability that the mortgagee will prevail on a final hearing of the cause" (735 ILCS 5/15-1701(b) (West 2008)), which necessarily includes some weighing of the merits of the case. Thus, the fact that we previously found that there was a question of fact as to defendants' affirmative defenses is not incompatible with the trial court's conclusion that, upon hearing further evidence, the Forest Preserve has a reasonable probability of prevailing below.[6]

¶ 35    In their brief, defendants address only the trial court's finding as to their TILA defense, so we focus on its analysis on that issue. Defendants alleged in their affirmative defenses that Amcore failed to make necessary disclosures under TILA, and we previously found that they had raised a question of fact as to whether TILA applied to the loan transaction. *BMO Harris*, 2016 IL App (1st) 151338-U, ¶ 52. After the evidentiary hearing, in its order, the trial court found that the statute applied to consumer credit transactions and that, "[u]nder the loan documents," Royalty Properties and Cannon Squires Properties were the borrowers, so no credit was extended to any natural persons "and this defense fails as a matter of law." Defendants argue that this finding was contrary to our holding in the prior appeal, where we found that the trial court should not have focused on the label placed on the loan documents

---

[6] We note that the trial court's finding does not, in fact, mean that the Forest Preserve *will* prevail after a full trial. All the trial court was required to do was find that there was a *reasonable probability* of it prevailing.

20

alone. See *BMO Harris*, 2016 IL App (1st) 151338-U, ¶ 51. We do not find this argument persuasive.

¶ 36    In our prior appeal, the issue that we considered was the Forest Preserve's focus on the loan as commercial, not consumer, based on the loan documents, which labeled the loan "commercial." *BMO Harris*, 2016 IL App (1st) 151338-U, ¶ 52. We found that, in focusing on the label placed on the documents, the trial court improperly focused on Amcore's purpose in making the loan, instead of looking to " 'the borrower's purpose in obtaining the loan.' " *BMO Harris*, 2016 IL App (1st) 151338-U, ¶ 52 (quoting *People's Bank*, 2015 IL App (1st) 133775, ¶ 28). In its order after the evidentiary hearing, however, this was not the basis of the trial court's finding. Instead, the trial court found that TILA did not apply as a matter of law because the "borrowers" under the loan were not natural persons. This was an argument apparently made by the Forest Preserve only in a petition for rehearing in our prior appeal and so we expressly declined to consider it in that appeal. See *BMO Harris*, 2016 IL App (1st) 151338-U, ¶ 53. Thus, the trial court's finding that there was a separate reason that the TILA defense failed is not inconsistent with our holding in the prior appeal.

¶ 37    Since defendants do not challenge any of the trial court's findings of fact concerning the merits of their affirmative defenses (other than those arguments addressed above), we proceed to consider whether defendants showed good cause for remaining in possession of the property. As noted, the mortgagee is presumptively entitled to possession of nonresidential property "except that if the mortgagor shall object and show good cause, the court shall allow the mortgagor to remain in possession." 735 ILCS 5/15-1701(b)(2) (West 2008). In the case at bar, defendants' arguments for "good cause" essentially boil down to the argument that they took good care of the property when it was under their management and

that the Forest Preserve has allowed the property to deteriorate. However, we have rejected such arguments in the past, finding that the argument that the mortgagor is in the best position to preserve the property is "an insufficient basis to find that there is good cause to permit the mortgagor to retain possession of the subject property." *Bank of America*, 401 Ill. App. 3d at 176. Furthermore, as defendants themselves note, the Forest Preserve will not be the entity in charge of maintaining the property (the receiver will be), so its prior stewardship of the property is irrelevant to the issue of whether good cause exists. Accordingly, we cannot find that the trial court erred in finding no good cause preventing the appointment of a receiver.

¶ 38     As a final matter, defendants accuse the trial court of truncating the hearing, which they claim unfairly prejudiced them. However, defendants did not raise any issues with the length of the hearing during the two-day hearing itself and did not claim before the trial court that they were not permitted to present certain evidence. Issues not raised in the trial court are forfeited on appeal. *Thompson v. N.J.*, 2016 IL App (1st) 142918, ¶ 21. The purpose of such forfeiture rules "is to encourage parties to raise issues in the trial court, thus ensuring both that the trial court is given an opportunity to correct any errors prior to appeal and that a party does not obtain a reversal through his or her own inaction." *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 14. In the case at bar, had defendants objected below, the trial court would have had the opportunity to address defendants' concerns. Reading the record, prior to breaking after the morning of the second day of the hearing, the trial court asked defense counsel how long he would need that day, and counsel responded that "I want to finish the whole hearing today." The trial court informed the parties that they would have until 3 p.m. because the court had another obligation, and defense

22

counsel's only response was "[t]hank you." Defense counsel did not indicate that this would not be enough time. Similarly, after defendants had presented the testimony of their witnesses, defense counsel did not in any way indicate that there was any additional evidence that remained to be presented and proceeded to present defendants' closing argument. Consequently, we cannot find any basis for reversing the trial court's order based on the length of the hearing.

¶ 39                                        CONCLUSION

¶ 40        For the reasons set forth above, we cannot find that the trial court erred in appointing a receiver for the property.

¶ 41        Affirmed.