2026 IL App (1st) 232227

SECOND DIVISION
January 27, 2026

No. 1-23-2227

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| JIM BALZER, | ) | Appeal from the |
|     Plaintiff-Appellant, | ) | Circuit Court of |
| | ) | Cook County |
| | ) | |
|     v. | ) | 2019 CH 10061 |
| | ) | |
| NORTHEAST ILLINOIS REGIONAL COMMUTER | ) | Honorable |
| RAILROAD CORPORATION, d/b/a Metra, | ) | Caroline K. Moreland, |
|     Defendant-Appellee. | ) | Judge Presiding |
| | ) | |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Van Tine and Justice D.B. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1  When does one "receive" an email? That is the question at the heart of this Freedom of Information Act (FOIA) case. On July 31, 2019, plaintiff Jim Balzer sent a FOIA request to the Northeast Illinois Commuter Railroad Corporation, more commonly known as Metra (Metra), seeking a smorgasbord of records about Metra's battery recycling contracts. But that email did not make it to Metra's FOIA officer right away; the agency's third-party email software service, Mimecast, stopped it and held it in a security queue, thinking it might be suspicious. The day after Balzer sent the email, August 1, Metra's FOIA officer released it from Mimecast's security queue and acknowledged receipt.

¶ 2  The FOIA requires Metra to respond to Balzer's request within five business days. Metra

formally denied Balzer's request on August 8, the sixth business day after Balzer sent his request, but only the fifth business day after Metra's FOIA officer became aware of it. Was Metra's response timely?

¶ 3     Our answer is no. We hold that Metra received the email on July 31, the day Balzer sent it and Metra's third-party software received and quarantined it. As such, Metra's response to Balzer on August 8, six business days later, was untimely. We reverse and remand for further proceedings.

¶ 4                                    BACKGROUND

¶ 5     On Wednesday, July 31, 2019, at 11:49 a.m., Jim Balzer sent an email from his private email account to a Metra email account designated for FOIA requests. In that email, Balzer requested "Copies of all records, documents, reports, forms, writings, letters, memos, books, papers, photos, microfilms, interoffice memos, cards, tapes, recordings, electronic data processing records, electronic communications, record information from January 1, 2016 through and including July 31, 2019 for IFB 37567 (battery recycling contract for Metra)[.]"

¶ 6     Unbeknownst to Balzer, at least at that moment, that message did not reach Metra's FOIA officers right away. Metra's third-party email security screening software, Mimecast, apparently flagged the email as suspicious. So instead of forwarding it on to the FOIA account, Mimecast held it in a security queue for the remainder of that day.

¶ 7     At 8:14 a.m. the next day, Thursday, August 1, Mimecast automatically sent Metra's FOIA account a message saying that Balzer's email was being held in that queue. One of Metra's FOIA officers released the message from Mimecast a minute later, at 8:15 a.m.; Angela Ollie, a paralegal and one of Metra's FOIA officers, emailed Balzer back and acknowledged receipt of his request at 8:27 a.m. that same day.

No. 1-23-2227

¶ 8     A little less than an hour later, at 9:18 a.m., Metra sent its first substantive email response to Balzer, though it is irrelevant to our appeal. In that first email, Metra told Balzer that it assumed he was making his request for a commercial purpose, which would entitle Metra to a larger 21-day response time. See *id.* § 3.1. It was not the only time Metra so claimed during this email chain, but each time Balzer objected and denied that he was making his request for a commercial purpose. As Metra has not pursued this point on appeal and abandoned it below as well, we will not dwell on it.

¶ 9     The remainder of the email exchanges on August 1 are highly relevant and outlined in detail below.

¶ 10                          I. Email Exchanges on August 1

¶ 11    At 9:35 a.m. on August 1, Metra wrote to Balzer:

> "Your recent FOIA Request *** is categorical in nature and rather broad. It would be unduly burdensome to fulfill such a Request. Examples of documents that we may be able to provide you with include: contracts, bid tabulation sheets, purchase orders, etc. Will you please narrow your Request? Please bear in mind, you can submit future requests for additional documents at your leisure."

¶ 12    At 9:50 a.m., Balzer replied. Beyond denying that his request was for a commercial purpose, Balzer wrote: "I *** therefore anticipate Metra's strict compliance with FOIA Statute."

¶ 13    At 9:53 a.m., Metra wrote back: "Thank you for your reply. We will make note that you did not submit this Request for Commercial purposes. As such, we will either extend or respond to your above-named Request in accordance with FOIA. However, and per our recent email to you, will you please narrow your Request?"

¶ 14    At 9:55 a.m., Balzer replied: "Not necessary to narrow FOIA request for information.

- 3 -

Either you possess it or not." Then at 10:03 a.m.: "There is either 'do' or 'do not.' It is not necessary to narrow the request."

¶ 15   At 10:18 a.m., Metra replied:

"I assure you, Metra is willing to provide you with responsive records / information in its possession in accordance with the [FOIA]. However, your Request is categorical and broad; there is a voluminous amount of information that may be responsive to your Request as it is currently written. To ask for, for example, all writings or all papers would require, on our part, a lengthy search of our various departments for anything written on paper, which may or may not be responsive to your Request. This voluminous search does not include the redaction and review process that is also part of our preparation of your Response. In light of same, I am willing to discuss *what can be done to make your Request more manageable* so that we may respond expeditiously. *Will you please narrow your Request.* Again, please bear in mind, you can submit future requests for any additional documents at your leisure."

¶ 16   At 10:41 a.m., Balzer replied: "Gee, Sorry, No."

¶ 17   At 3:06 p.m., in addition to additional discussion concerning whether Balzer was seeking the information for a commercial purpose, Metra wrote back:

"Additionally, I would like to reiterate that Metra looks forward to providing you with any records in our possession which are responsive to your Request. To comply with your Request as it is currently written would be unduly burdensome, and the burden to comply with this Request outweighs the publics' [*sic*] interest in the information. *Asking you to narrow your Request is an attempt to make locating, redacting, and reviewing any responsive records manageable so that we may comply with your Request and provide*

*you with responsive records. Will you please narrow your Request?* If you have any questions or concerns in this regard, please let us know; we look forward to working with you."

¶ 18    At 3:44 p.m., after discussion about the "commercial purpose" issue, Balzer wrote:

"I expect Metra to comply within statutory guidelines and timelines to my non-commercial FOIA request. Meanwhile, kindly stop wasting time composing dithering e-mails, and instead direct your attention to performing your job, here fulfilling my properly filed FOIA request."

¶ 19    That was the last email exchange between Balzer and Metra's FOIA department on August 1.

¶ 20    Between the dates of Thursday, August 1, through and including Wednesday, August 7, no communication took place between Metra and Balzer.

¶ 21                                II. August 8 Denial

¶ 22    On Thursday, August 8, Metra sent Balzer a formal email denying his request as unduly burdensome under section 3(g) of the FOIA. See 5 ILCS 140/3(g) (West 2018). Metra told Balzer that his request was broad and voluminous and would be disruptive to the day-to-day operations of the various departments that would have to locate and review records. Since Balzer repeatedly refused to narrow his request, the agency was denying it.

¶ 23    The denial letter identified the attorney and the FOIA officer (Ollie) involved in the matter on Metra's behalf. The denial letter also informed Balzer of his right to challenge the agency denial, either via the Attorney General's "Public Access Counselor" (PAC) for certain decisions or by seeking injunctive and declaratory relief in court. See *id.* § 9.5 (providing for appeals of certain decisions to PAC); *id.* § 11 (permitting suits for injunctive or declaratory relief

against agency).

¶ 24                          III. Circuit Court Proceedings

¶ 25    Balzer chose the latter option. He filed suit against Metra in circuit court. In his complaint seeking declaratory judgment and injunctive relief, Balzer claimed that Metra had not timely denied his FOIA request; it denied his request on the *sixth* day after receiving it, not the fifth. He asked for the documents in his original FOIA request, attorney fees and costs, and a civil penalty against Metra.

¶ 26    This unusually lengthy and contentious litigation featured (among other things) motions filed by Balzer for substitution of judge for cause and even challenging the authority of the judge who ruled on the motion for substitution of judge, as well as multiple motions for sanctions Balzer filed. Ultimately, the parties agreed to a narrower scope of records. In June 2021, Metra turned over a series of documents pertaining to the battery recycling contract.

¶ 27    Six months later, Balzer moved for summary judgment, arguing that he was the prevailing party and thus entitled to his attorney fees. See *id.* § 11(i) (permitting attorney fees to prevailing party). He also sought a civil penalty against Metra. See *id.* § 11(j) (permitting civil penalty against agency for intentional noncompliance with FOIA or acting in bad faith).

¶ 28    Balzer argued that Metra received his FOIA request on July 31, 2019, when the Mimecast service flagged his email as suspicious and put it into the security queue. Thus, in his view, when Metra denied his request on August 8, six business days later, that denial was untimely.

¶ 29    Metra cross-moved for summary judgment, arguing that it timely denied Balzer's FOIA request and that his request was unduly burdensome and thus exempt from disclosure under section 3(g) of FOIA. See *id.* § 3(g). Metra provided affidavits to support its position that Balzer's request was unduly burdensome. Most notable was that of the FOIA officer, Ms. Ollie.

¶ 30     Ollie swore that her initial search yielded hundreds of pages of documents in procurement files related to various recycling and scrap metal agencies, spreadsheets with purchase order releases and invoice amounts, and various contractual documents. She also found various invoices tied to the recycling contracts. Many were paper records that would have to be requested from storage, while others were saved in Metra's contracting software and would require individual downloading. She determined it would take weeks to find, review, and redact the relevant documents. And then there were emails, of which a preliminary search netted more than 100,000 that might be relevant. She determined that searching through them and redacting any exceptions could take months and severely interfere with the agency.

¶ 31     The circuit court granted summary judgment to Metra and denied Balzer's motion. The court first concluded that the five-business-day mandate for an agency to respond to a FOIA request begins when the agency actually receives and acknowledges the request, which happened here on August 1, after the FOIA officer released Balzer's email from the Mimecast security queue. When Metra formally denied it five business days later, on August 8, 2019, it did so on the fifth business day, a timely denial.

¶ 32     The circuit court also agreed with Metra that Balzer's original request was unduly burdensome, as he requested a broad range of documents and files. The court noted Metra's repeated attempts to narrow the scope of his request. Balzer now appeals.

¶ 33                                    ANALYSIS

¶ 34     This case comes to us on cross-motions for summary judgment. Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2024). When the parties cross-move for summary judgment, they concede the absence of a genuine issue of material fact. *Nationwide*

*Financial, LP v. Pobuda*, 2014 IL 116717, ¶ 24. We are not bound by their concession, but here we agree that no disputed issues of material fact exist. *Id.*

¶ 35     We thus apply *de novo* review to questions of law. *Corbett v. County of Lake*, 2017 IL 121536, ¶ 18. We may affirm on any basis in the record, regardless of whether the circuit court relied on that ground. *Village of Bartonville v. Lopez*, 2017 IL 120643, ¶ 34.

¶ 36     This appeal involves an interpretation of the FOIA. Our goal is to divine legislative intent, best expressed by the legislation's plain language. *Land v. Board of Education of Chicago*, 202 Ill. 2d 414, 421-22 (2002). We read a statutory scheme as a whole, interpreting words not in isolation but with regard to other provisions. *Corbett*, 2017 IL 121536, ¶ 27. We strive for an interpretation that does not produce absurd or illogical results and is compatible with the overall intent and purpose of the legislation. See *id.*

¶ 37                                            I

¶ 38     Before diving into specifics, we lay some foundation. Citizens generally have the right to obtain public records from a public body like Metra. 5 ILCS 140/3(a) (West 2018). Requests must be in writing and may be submitted, among other ways, by email. *Id.* § 3(c). As noted, the FOIA provides that "[e]ach public body shall *** either comply with or deny a request for public records within 5 business days after its receipt of the request, unless the time for response is properly extended under subsection (e) of this Section." *Id.* § 3(d).

¶ 39     There are four possible responses a public body may provide within those five days: (1) comply with the request, (2) deny the request, (3) extend the time to respond, or (4) fail to do any of the first three things. *Id.* We will take these options out of order. And we can skip the first one, for if the public body complies with the request, everyone goes home happy; the courts never get involved.

¶ 40    The public body may extend the five-day deadline on certain enumerated grounds or by agreement. *Id.* § 3(e). For certain specified reasons (such as the need to consult with other public bodies or other departments within its own agency), the public body may assert its right to an additional five days to comply with the request. *Id.* Or the public body and the requestor can agree to an extension of whatever length of time. *Id.* This, of course, did not happen here.

¶ 41    The public body may deny the request, but if so the "[d]enial shall be in writing as provided in Section 9" of the FOIA. *Id.* § 3(d). Section 9, for its part, requires that the public body formally notify the requestor of the denial and of the requestor's right to seek further review of the decision. Specifically, under section 9, the public body shall

> "notify the requester in writing of the decision to deny the request, the reasons for the denial, including a detailed factual basis for the application of any exemption claimed, and the names and titles or positions of each person responsible for the denial. Each notice of denial by a public body shall also inform such person of the right to review by the Public Access Counselor and provide the address and phone number for the Public Access Counselor. Each notice of denial shall inform such person of his right to judicial review under Section 11 of this Act." *Id.* § 9(a).

¶ 42    And finally, for whatever reasons of oversight, mistake, or bad faith, the public body might fail to do any of the previous three things—comply, deny, or extend—within the five-day window. Such inaction is treated as a denial. *Id.* § 3(d) ("Failure to comply with a written request, extend the time for response, or deny a request within 5 business days after its receipt shall be considered a denial of the request."). That inaction/denial carries two consequences: (1) if the public body ultimately produces records to the requestor, it cannot charge a fee, and (2) the public body is thereafter foreclosed from complaining that compliance with the request

would be unduly burdensome. *Id.*

¶ 43    With this in mind, we turn to the specific issues raised by this appeal.

¶ 44                                                    II

¶ 45    We begin with the question of when Metra "received" Balzer's FOIA request under section 3(d). See *id.* As noted, section 3(d) of the FOIA requires that "[e]ach public body shall *** either comply with or deny a request for public records within 5 business days after its receipt of the request." See *id.*

¶ 46    The parties agree, and so do we, that "5 business days after its receipt" (*id.*) means that the day of receipt, itself, is not included in the five-day calculation. See 5 ILCS 70/1.11 (West 2024) (in counting time where an act is to be performed within a particular period the first day is to be excluded and the last day included); *People v. Ribar*, 336 Ill. App. 3d 462, 463-64 (2003).

¶ 47    But that begs the question of which day Metra "received" the FOIA request under section 3(d). Balzer says that day is Wednesday, July 31, the day he emailed the request to Metra's designated email for FOIA requests. Metra says that day is Thursday, August 1, the first day that Metra *learned* of the request, after its third-party security software initially quarantined the email on July 31. If Metra is correct, then its denial of the FOIA request on Thursday, August 8 came on the fifth business day after "receipt" of the FOIA request and was timely.

¶ 48    But as we explain below, we agree with Balzer that Metra "received" the FOIA request on the day Balzer sent it, July 31. So any response from Metra was due Wednesday, August 7, the fifth business day after July 31. Metra's August 8 response was untimely.

¶ 49    The FOIA does not define "receipt." The parties have cited no Illinois decisions on point. The panel of this court hearing worker's compensation appeals has interpreted " 'receipt' " as "coming into possession of." *South Berwyn School District #100 v. Illinois Workers'*

*Compensation Comm'n*, 2024 IL App (1st) 230722WC-U, ¶ 19. That is consistent with the verb form of the word, "receive," which the dictionaries define as "to come into possession of or get from some outside source" or "to come into possession of: acquire."[1]

¶ 50     When Balzer emailed his FOIA request to Metra at the address designated by Metra, in every relevant sense that request came into Metra's possession. Metra and Metra alone identified an email address for requesters to send FOIA requests by email. Metra and Metra alone set up a system that delegated initial receipt of those emails to a third-party screener, Mimecast. That was Metra's choice, Metra's decision, a system of Metra's own creation (or at least adoption). The request was certainly no longer in the possession of Balzer, who had done all he was asked to submit a formal request.

¶ 51     Metra cannot, of its own accord, delegate the responsibility for "receiving" its FOIA requests to some third party and then blame its delegee for the delay in receipt. Metra cites to no authority under the FOIA that would allow it to toll the five-business-day window, and we can think of no reason why Metra should be able to benefit from a delay solely attributable to something on its side of the ledger.

¶ 52     Imagine, for example, how Metra's reasoning would apply had Balzer sent his request by U.S. mail, which he could have done. See 5 ILCS 140/3(c) (West 2018). If the Metra mail clerk forgot to walk the letter up to the FOIA officer until the following business day after it arrived, would Metra be entitled to an additional business day to respond, simply because the FOIA officer learned of it a day late? Of course not. We would charge Metra with knowledge of receipt

---

[1] See, respectively, RECEIVE, Black's Law Dictionary (12th ed. 2024); "Receive," merriam-webster.com, https://www.merriam-webster.com/dictionary/receive?src=search-dict-box (site last visited Jan. 5, 2026).

the moment the letter landed in Metra's mail room. We see no reason why the result should be any different in our context. See *Insight Systems Corp. v. United States*, 110 Fed. Cl. 564, 577 (2013) (in discussing government's "receipt" of electronic communications, comparing "government computer server" to "a clerk in a government mail room").

¶ 53    The law has generally been loath to let recipients of emailed notices avoid deadlines by blaming spam filters or other security devices on the recipient's side of the communication. See, *e.g.*, *Moore v. Duncanville Independent School District*, 358 F. App'x 515, 517 (5th Cir. 2009) (*per curiam*) (attorney who claimed he did not receive opponent's motion for summary judgment because it landed in his spam folder was not entitled to extension of deadline); *Boyd v. Monroe City Hall*, No. 3:20-CV-01473, 2021 WL 1305385, at *4 (W.D. La. Mar. 8, 2021) (right-to-sue email sent on August 17 was deemed "received" on that date, even though email was diverted to plaintiff's computer's spam folder and plaintiff was unaware of it), *report and recommendation adopted*, No. 3:20-CV-01473, 2021 WL 1299204 (W.D. La. Apr. 7, 2021).

¶ 54    The question in *Insight Systems*, 110 Fed. Cl. at 570, was whether the plaintiffs' emailed bids on a government contract were timely, which in turn rose or fell on when the government "received" those emailed bids. The bidders' emails only reached the first level of government servers, which performed security screening on the emails but were unable to forward them to the next level of servers (the "bridgehead" servers), much less on to the destination email address, until after the deadline for bids had run. *Id.* at 570-71. When the bids ultimately reached the destination email address, they were denied as untimely. *Id.* at 572. The court of federal claims ruled that the "proposals in question were 'received' when the [initial] server 'took' the electronic messages submitted by plaintiffs, submitted them to security checks, and, once those checks were passed, attempted to forward them, albeit unsuccessfully, to the second server in

[the agency's] mail system." *Id.* at 577.

¶ 55　We see little difference between *Insight Systems* and our case. Metra, to be sure, would argue that here, the security system was outside Metra's computer system, operated by a third party, Mimecast. But again, that's only because Metra set things up that way. Metra should be charged with the responsibility for ensuring compliance with the five-business-day requirement no matter how it chooses to structure its security procedures.

¶ 56　We find further support in state law that was not in effect at the time of these email exchanges between Metra and Balzer and thus is merely confirmatory, not controlling. Illinois has now adopted the Uniform Electronic Transactions Act (UETA). See 815 ILCS 333/1 *et seq.* (West 2022). The UETA has been adopted in nearly every state; Illinois adopted it in 2021. See Pub. Act 102-38 (eff. June 25, 2021). The UETA covers, among many other things, interactions involving the government. See 815 ILCS 333/2(11), 3 (West 2022); see *South Berwyn School District #100*, 2024 IL App (1st) 230722WC-U, ¶ 23.

¶ 57　Under section 15(b) of the UETA, an electronic record is received when "it enters an *information processing system that the recipient has designated or uses for the purpose of receiving electronic records or information* of the type sent and from which the recipient is able to retrieve the electronic record." (Emphasis added.) 815 ILCS 333/15(b) (West 2022). That record is deemed received "even if the place the information processing system is located is different from the place the electronic record is deemed to be received." *Id.* § 15(c).

¶ 58　If Metra, of its own accord, designated Mimecast's processing system to initially receive its electronic FOIA requests, that request would be deemed "received" by Metra when Mimecast received it. Indeed, it would be deemed "received" at that moment regardless of whether Mimecast, much less Metra, was aware of it: "[a]n electronic record is received under subsection

(b) even if no individual is aware of its receipt." *Id.* § 15(e).

¶ 59    Again, Illinois's adoption of the UETA post-dates the emails at issue here, but it is comforting that our reasoning is consistent with the law adopted nearly nationwide. See *Insight Systems*, 110 Fed. Cl. at 581 ("The UETA, which has been adopted in almost every state, holds that an electronic document is received when it enters the recipient's computer system."); Jevon C. Bindman, Note, *The Spam Filter Ate My E-Mail: When Are Electronic Records Received?*, 39 Wm. Mitchell L. Rev. 1295, 1330 (2013) ("[R]ecipients should be responsible for the actions of their spam filters, even if the filter is located outside of the recipient's system or operated by a third-party agent of the recipient. If a message is incorrectly filtered by an overactive spam filter within the recipient's control, the recipient has a responsibility to check her junk mail folder or otherwise be held responsible for receipt of the message.").

¶ 60    Metra can and should do what it deems necessary to protect itself from potential security threats. A public-transit agency should do nothing less in this day and age. Indeed, a recent amendment to the FOIA itself provides, "[a]s a cybersecurity measure," that "no public body shall be required to open electronically attached files or hyperlinks to view or access details of a request." Pub. Act 104-438 (eff. Jan. 1, 2026) (amending 5 ILCS 140/3(c)). It is commendable for Metra to employ security safeguards to evaluate potential security threats. But that doesn't buy Metra extra time under the FOIA to comply with requests.

¶ 61    If we ruled otherwise, the initial five-day period to respond to requests would become a fungible number. Here, the request was filed with Metra near noon on July 31 and reached Metra's desk at 8:14 a.m. the next morning. But what if a public body's security measures quarantined an email for *three* days? Five days? By Metra's logic, any amount of time that its security system delayed the request would hold off the start of the five-business-day clock.

¶ 62    If Metra could demonstrate that, for reasons utterly outside its control, Balzer's email never reached its email server (or that of any delegee like Mimecast), we might reach a different outcome, something we need not decide. Perhaps we would feel different if Metra for some reason did not learn of the email until it was too late to respond—something else we need not decide.

¶ 63    But here, Metra learned of the Balzer FOIA request the very next day after it was sent. It still had four business days to respond. And we reiterate that a public body like Metra, for many reasons, including an inability to comply with the request within the first five days, can give itself an extension of five business days on its own. See 5 ILCS 140/3(e) (West 2018). Metra had more than enough time to adjust to the very modest delay imposed by its third-party security software.

¶ 64    Maybe the FOIA should be amended, given the many security threats these days, to provide for a reasonable period of time for such security quarantines—maybe two days, maybe a week, or maybe the legislature could create some additional procedures and safeguards on this important subject. But that is for the General Assembly to decide, not the judiciary. As things stand now, there is no exception in the FOIA that tolls the public body's five-business-day period because a system that the public body itself created or adopted caused an internal delay in a request reaching its FOIA officer's desk. We will not judicially read one in.

¶ 65    Metra's August 8 denial letter came on the sixth business day following Metra's "receipt" of the FOIA request on July 31. That letter was untimely.

¶ 66                                        III

¶ 67    Metra claims the difference between July 31 and August 1 as a starting point for "receipt" makes no difference, because it denied the request during its email exchange with Balzer on

August 1. Either way, then, its denial was easily within the five-day window for responding. Metra did not raise this argument in the briefs on the cross-motions for summary judgment below. Still, we will consider the argument, as we may affirm on any basis in the record, see *Lopez*, 2017 IL 120643, ¶ 34, and Balzer briefed the issue in his response brief on appeal.

¶ 68    Metra's position is that its email exchanges on August 1 constituted a denial of Balzer's request on the ground that the request was unduly burdensome under section 3(g) of the FOIA. See 5 ILCS 140/3(g) (West 2018). Section 3(g) reads in relevant part:

> "Requests calling for all records falling within a category shall be complied with unless compliance with the request would be unduly burdensome for the complying public body and there is no way to narrow the request and the burden on the public body outweighs the public interest in the information. Before invoking this exemption, the public body shall extend to the person making the request an opportunity to confer with it in an attempt to reduce the request to manageable proportions. If any public body responds to a categorical request by stating that compliance would unduly burden its operation and the conditions described above are met, it shall do so in writing, specifying the reasons why it would be unduly burdensome and the extent to which compliance will so burden the operations of the public body. Such a response shall be treated as a denial of the request for information." *Id.*

¶ 69    While not a model of legislative draftsmanship, this provision is relatively clear. "Section 3(g) of the FOIA exempts disclosure where (1) a request for all records falling within a category would be unduly burdensome for the complying public body, (2) there is no way to narrow the request, and (3) the burden on the public body outweighs the public interest in the information." *Hites v. Waubonsee Community College*, 2018 IL App (2d) 170617, ¶ 55.

¶ 70    As a precursor to finding that "there is no way to narrow the request," the public body "shall extend" to the requestor "an attempt to reduce the request to manageable proportions." 5 ILCS 140/3(g) (West 2018). If the public body extends that opportunity and determines that a narrower request is infeasible—because, for whatever reason, the parties cannot agree on a narrower request—the public body may deny the request as unduly burdensome. Then and only then will the public body's response "be treated as a denial of the request." *Id.*

¶ 71    Said differently, unless the public body has invited the requestor to narrow his request and determined that a narrower request is not feasible, the public body cannot validly deny the request. See *Heinrich v. White*, 2012 IL App (2d) 110564, ¶ 21 (agency could not invoke section 3(g) exemption, as it failed to extend opportunity to narrow request); *National Ass'n of Criminal Defense Lawyers v. Chicago Police Department*, 399 Ill. App. 3d 1, 15 (2010) (agencies' failure to try to narrow request was fatal to claim of section 3 exemption).

¶ 72    Metra argues that, during its email exchange with Balzer on August 1, it repeatedly offered to discuss a narrower request, repeatedly invoked the "unduly burdensome" exception, and explained its difficulties in complying with the request as written. And each time, of course, in increasingly curt and hostile language, Balzer rejected any notion of compromise. In Metra's view, that email chain checked all the boxes for a section 3(g) denial.

¶ 73    We agree that Metra did everything required of it to set up a denial. Twice during its August 1 email exchange, Metra used the phrase "unduly burdensome." At least once, it explained how compliance with Balzer's request would hinder Metra's operations, including specifics. Four different times, Metra asked Balzer to narrow his request. And to be sure, Balzer replied in no uncertain (or polite) terms that he would not consider a narrower request. Metra set everything in place on August 1 to tee up a denial of this request.

¶ 74    But it never actually denied the request—not on August 1, at least. Recall in our earlier discussion that, if the public body denies the FOIA request, the "[d]enial shall be in writing as provided in Section 9" of the FOIA. 5 ILCS 140/3(d) (West 2018). Section 9 requires the public body to formally notify the requestor of the denial and the reasons therefor, the attorneys and FOIA officers involved in the decision, and the requestor's right to seek further review of the decision. *Id.* § 9(a). Metra never told Balzer on August 1 that his request was denied. None of the disclosures required under section 9(a) were included in anything Metra told Balzer.

¶ 75    None of this should come as a surprise to Metra, which knew this full well. Its August 8 letter to Balzer followed the requirements of section 9(a) to the letter. Whatever its lawyers may now say in court, Metra knew it had not "denied" Balzer's request on August 1; it knew it was required to send a formal denial per section 9. The only thing Metra did wrong, unfortunately, is wait one day too long to send that denial.

¶ 76    Under the argument Metra now makes in court, as long as Metra told Balzer the request was "unduly burdensome" and offered him a chance to narrow his request, the request was automatically, *sub silentio* denied. If that were true, as Balzer notes, then Metra denied Balzer's FOIA request four different times in that August 1 email chain. Why keep going after the first denial? And more to the point still, why send the August 8 letter at all?

¶ 77    The reason for that August 8 letter, as Metra well knew, was to formally deny the FOIA request in compliance with section 9. Absent a formal notification under section 9, a requestor like Balzer would have to read between the lines and somehow infer a "denial" without the agency ever saying the word "denied." That runs against all notions of good government, making a requestor guess as to whether and when his request is denied. The "when," alone, is important for citizens to know, as clocks start running on their rights after their requests are denied.

¶ 78   There should be no mystery involved. If nothing else, the agency owes the requestor a clear denial, the reasons for that denial, and an explanation of his further remedies should he wish to challenge the denial, all of which section 9 requires. If we adopted Metra's view, section 9, at least insofar as it concerns denials under section 3(g), would be a dead letter.

¶ 79   Metra directs us to an opinion from the Public Access Counselor, or "PAC," housed within the Office of the Attorney General and responsible for adjudicating many FOIA disputes. See *id.* § 9.5 (explaining duties of PAC). The PAC may issue opinions binding on the parties and advisory opinions. See *id.* § 9.5(f), (h). Opinions of the PAC do not bind the courts, but we give considerable weight to a well-reasoned opinion from the office. See *Burris v. White*, 232 Ill. 2d 1, 8 (2009). The opinion on which Metra relies is Public Access Opinion 16-008 (Nov. 1, 2016).[2]

¶ 80   There, Mary Drumm sent a FOIA request to the city of Collinsville seeking various emails. *Id.* at 1-2. On July 20, 2016, the city wrote to Ms. Drumm that " 'the request is broad and consequently could be unduly burdensome in that there are over 50 emails consisting of over 100 pages plus numerous pages of attachments.' " *Id.* at 2. The city added that " '[e]ach individual page would need to be retrieved by our IT personnel and reviewed by the FOIA Officer to determine if such information is exempt *** in whole or in part, and redactions may be necessary.' " *Id.* The city requested that Ms. Drumm narrow her FOIA request by July 27, 2016, " 'so that it would no longer be unduly burdensome and/or interfere with operations.' " *Id.*

¶ 81   The very next day, Ms. Drumm appealed to the PAC, claiming the city denied her request as unduly burdensome. *Id.* The city responded that it had not intended to deny the request, but

_____

[2] Public Access Opinion 16-008 is available at https://illinoisattorneygeneral.gov/Page-Attachments/FOIAPAC/2016-Binding-PAC-Opinions/16-008.pdf (last visited January 6, 2026).

the PAC ruled that, regardless of whether the city intended to do so, "by asking [Drumm] to narrow it 'so it would no longer be unduly burdensome,' the City's response constitutes a denial of the request under the plain language of section 3(g) of FOIA." *Id.* at 3, 5-6.

¶ 82    We cannot adopt the PAC's interpretation for the reasons we have given above. Under the PAC's read, before invoking the "unduly burdensome" exemption, public bodies need not conclude that "there is no way to narrow the request." 5 ILCS 140/3(g) (West 2018). They need not ever tell requestors, in clear language, that their request is denied. *Id.* § 9(a). They need not tell requestors which officers and lawyers of the public body were a part of the decision to deny. They need not explain the requestors' appeal rights to either the PAC or the courts. A clear requirement in section 3(g) would be eliminated, and section 9(a) would be wiped off the books for section 3(g) denials. In its place, the public body may simply say the request is unduly burdensome and ask them to narrow it—without waiting for an answer—and *sub silentio*, by operation of law, the request has been denied, whether the agency intended it or not, whether the requestor knew it or not. That is not what FOIA says nor what it could have intended.

¶ 83    Of course, as discussed earlier, a public body's failure to comply with, deny, or extend within five business days is treated, itself, as a denial. See *id.* § 3(d) ("Failure to comply with a written request, extend the time for response, or deny a request within 5 business days after its receipt shall be considered a denial of the request."). If the reader is wondering why we went to all this trouble only to arrive at the same conclusion—a denial—it is not quite that simple.

¶ 84    A denial by operation of law, after the public body fails to respond, carries two adverse consequences to the public body: (1) if the public body ultimately produces records to the requestor, it cannot charge a fee, and (2) the public body is thereafter foreclosed from complaining that compliance with the request would be unduly burdensome. *Id.* So that is a very

real difference indeed here, because Metra's only argument against compliance is the section 3(g) "unduly burdensome" exemption. By failing to effectively comply, deny, or extend within five business days, Metra has forfeited its only argument against compliance. See *id.*

¶ 85    Because the parties have already settled this matter insofar as the production of documents is concerned, the victory is pyrrhic for Balzer. But it does make him the prevailing party and thus entitled to attorney fees and costs. *Id.* § 11(i). Balzer is also seeking a penalty against Metra, which he is free to pursue. See *id.* § 11(j).

¶ 86    It gives us no pleasure to rule against Metra here, as the FOIA officer went to great lengths to address Balzer in good faith and in a courteous, helpful manner, only to be met with curt, dismissive, and outright rude responses from Balzer. The only mistake Metra made was being a day late in its denial, an innocent mistake but a mistake no less. Move Metra's response up one day, and we likely would have upheld Metra's denial and affirmed the circuit court. But that one day makes all the difference, so Balzer prevails.

¶ 87    The lengthy proceedings below included much litigation surrounding Balzer's attempts to disqualify judges and sanction his opponent. The circuit judge, who exhibited patience and professionalism at all times, will note on remand that the FOIA only entitles the prevailing party to "*reasonable* attorney's fees and costs." (Emphasis added.) *Id.* § 11(i).

¶ 88                                    CONCLUSION

¶ 89    The judgment of the circuit court is reversed. The cause is remanded for further proceedings.

¶ 90    Reversed and remanded.

---

*Balzer v. Northeast Illinois Regional Commuter R.R. Corp.*, 2026 IL App (1st) 232227

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-CH-10061; the Hon. Caroline K. Moreland, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Adam Goodman, of Goodman Tovrov Hardy & Johnson LLC, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | A. Jay Koehler, T. Allon Renfro, and Robert E. Elworth, of Swanson, Martin & Bell, LLP, of Chicago, for appellee. |

---